[No. B219979. Second Dist., Div. Three. Jan. 27, 2011.]

In re B.C., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
E.C., Defendant and Appellant;
N.D., Intervener and Appellant.

[No. B223063. Second Dist., Div. Three. Jan. 27, 2011.]

In re B.C., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
E.C., Defendant and Respondent;
EVE O. et al., Interveners and Appellants;
N.D., Intervener and Respondent;
B.C., Appellant.

**COUNSEL**

No appearance for Plaintiff and Respondent in B219979.

Law Office of Amir Pichvai and Amir Pichvai for Plaintiff and Respondent in B223063.

Nicole Williams, under appointment by the Court of Appeal, for Interveners and Appellants Eve O. and Sheri O.

Karen J. Dodd, under appointment by the Court of Appeal, for Minor and for Appellant.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant and for Defendant and Respondent.

Leslie A. Barry for Intervener and Appellant N.D. and for Intervener and Respondent.

## OPINION

**CROSKEY, Acting P. J.**—In this dependency case (Welf. & Inst. Code, § 300 et seq.), on the eve of a hearing to terminate parental rights to the minor (Welf. & Inst. Code, § 366.26) and determine whether the child's foster parents should be designated prospective adoptive parents (Welf. & Inst. Code, § 366.26, subd. (n)), the child's mother (mother) filed a relinquishment of her parental rights, designating the child's maternal aunt as the person with whom she intended the child to be placed for adoption (Fam. Code, § 8700, subd. (f)). Despite having been granted numerous opportunities to visit with the child, the aunt had failed to form a bond with the child, who was quite attached to the foster parents with whom he had spent much of his life. Nonetheless, the aunt, mother, and the Department of Children and Family Services (DCFS) sought the immediate placement of the child with the aunt, a position which brought them in conflict with the foster parents and the minor. At the hearing, the dependency court apparently believed that its hands were tied by mother's designated relinquishment. Upon receipt of the official acknowledgement of mother's relinquishment, the court immediately terminated the hearing, and lifted its previous order which had prevented DCFS from removing the child from the foster parents' home without court approval.

In these consolidated appeals, we review three earlier orders of the dependency court, as well as its order lifting its "do not remove" order.[1] We ultimately conclude that the court erred in lifting the "do not remove" order without conducting a hearing to determine whether placement with the aunt was " ' "patently absurd or unquestionably not in the minor's best interests." ' " (*In re R.S.* (2009) 179 Cal.App.4th 1137, 1150 [101 Cal.Rptr.3d 910].) We also conclude that the court erred in granting mother a continuance of the Welfare and Institutions Code section 366.26 hearing, which had been sought on the basis that mother needed additional time to complete her relinquishment of parental rights.[2] Finally, we find no error in the court's summary denial of two Welfare and Institutions Code section 388 petitions (for modification of prior order), which denial is challenged by mother and aunt.

---

[1] At the request of the minor and his foster parents, we issued a writ of supersedeas directing that the minor not be removed from his placement pending the finality of this appeal or further order of this court.

[2] As discussed below, the dependency court granted the continuance on a different basis than that sought.

## FACTUAL AND PROCEDURAL BACKGROUND

B.C. was born on September 27, 2008. At the time of his birth, his mother was in the custody of a law enforcement agency on a robbery charge, and subject to a mental health hold (Welf. & Inst. Code, § 5150). A DCFS social worker attempted to speak with mother, but mother refused. Mother had no plan for the care of the child while she was incarcerated, and DCFS could discover no relatives of mother. Shortly thereafter, mother was returned to jail, and DCFS placed the minor in a foster home. Throughout this case, the child's father has been unknown.

Mother appeared at the October 1, 2008 detention hearing, but she was not verbally responsive. The court indicated that the issue of the possible appointment of a guardian ad litem would be raised at the following hearing, as it was not clear if mother's muteness was caused by a physical or mental ailment. However, mother was released from jail three weeks after the detention hearing, and disappeared;[3] she would not be located again until August of 2009.

In the interim, the minor was adjudicated dependent,[4] and ultimately placed in the foster home of Eve O. and Sheri O. (foster parents). The minor was placed with foster parents on February 19, 2009; an adoptive home study had already been approved on their home.[5] The minor thrived in the home of foster parents, and strongly bonded with them. There is no suggestion in the record that foster parents' care for minor has been anything but exemplary or that the child does not feel safe, secure and happy in their home.

Although DCFS's efforts to find mother were unsuccessful, some of its contact letters reached mother's relatives. The relatives contacted DCFS, indicating that they had been searching for mother themselves. In early May 2009, mother's sister (aunt) stated that she would like to adopt the minor. Monitored visits were arranged for the child with aunt and members of her family, and a home study was begun. By the time of a June 12, 2009 hearing, DCFS had designated aunt as the prospective adoptive parent for the minor. By this date, the child had been in the home of foster parents for four months

---

[3] A DCFS social worker attempted to interview mother in jail shortly after the detention hearing. Mother appeared "jittery, incoherent and confused." At different times in the interview, mother stated that she (1) did not have a baby; (2) had a baby and did not want it; and (3) had a baby and wanted it. She also stated that in order for her to understand what was happening to her baby, her hair needed to breathe. The social worked concluded that mother was not mentally able to provide information to DCFS.

[4] The dependency was based on mother's mental and emotional problems rendering her unfit to provide care for the child, and her failure to make a plan for his ongoing care.

[5] The minor was placed with the O.'s when his initial foster parent declined to adopt him.

and was quite bonded to them. Under the circumstances, minor's counsel requested that DCFS not change the child's placement without first notifying the child's counsel and obtaining a court order. The court agreed, and issued the order. It is the court's subsequent lifting of this "do not remove" order that is the main issue on appeal.

Mother was finally located in August 2009; she was living in a mental health rehabilitation center in Long Beach. By this time, the court had set a Welfare and Institutions Code section 366.26 hearing for August 28, 2009. As mother had been located, she was personally served with notice of the hearing.

By the time of the August 28, 2009 hearing, foster parents had sought de facto parent status[6] (Cal. Rules of Court, rule 5.534(e)) and expressed their continued interest in adopting the minor. They presented evidence of the following facts: (1) the minor was continuing to thrive in their care; (2) the minor was deeply bonded to them, and they, in turn, loved him; (3) they were committed to having the minor remain close to, and have continued contact with, his maternal relatives; (4) although all of the maternal relatives had been encouraged to visit with the minor, aunt alone attended the bulk of the visits; (5) although aunt had been encouraged to visit three times per week, over the most recent 14 weeks, aunt visited only 15 times, frequently cancelling or simply not scheduling further visits; (6) aunt appeared over-whelmed at the visits, and frequently talked about how stressful the process was, rather than asking about the child or engaging with him; (7) as a result, the child was not comfortable being alone with the maternal relatives;[7] (8) at the first visit where the child was to be left alone with the relatives, the relatives phoned the foster parents after 15 minutes, saying the child had been crying inconsolably; he calmed immediately when foster parents picked him up; (9) after that visit, the child would become hysterical when foster parents were out of his sight; (10) the child had since become "unusually clingy" with foster parents, and experienced night terrors on days when he was separated from them; (11) aunt repeatedly stated that she wished DCFS had never found the maternal relatives; and (12) aunt confided to foster parents that although she and her husband planned to adopt the minor, they planned to have mother raise him, if she stayed on her medication.

DCFS, in contrast, still focused on aunt as the prospective adoptive parent for minor, planning frequent visits to aid in the transition of minor to aunt's home, and planning for aunt and her husband to participate in family therapy,

---

[6] De facto parent status was ultimately granted.

[7] Aunt has three children of her own. It was later revealed that aunt's youngest son, who is three months older than minor, is aggressive and sometimes bullies the minor. Maternal relatives admitted that minor was afraid of his cousin.

including "attachment therapy." DCFS appeared concerned with minor's "identity development," and his future desire to know about his origins— something believed to be a lifelong issue for all adopted children. It was DCFS's position that adoptive placement with aunt was in his best interests, as any short-term detriment he would suffer by being removed from foster parents would be less severe than the lifelong detriment he would experience by being adopted by nonrelatives.[8]

The court continued the Welfare and Institutions Code section 366.26 hearing to September 25, 2009. The court indicated that the issue of whether minor should be replaced in aunt's home would be considered at that hearing.

Despite the fact that the court indicated the issue of whether minor should be replaced would be considered at the continued hearing, aunt nonetheless filed a Welfare and Institutions Code section 388 petition seeking that replacement. Mother also filed a section 388 petition, arguing that the dependency court erred in failing to appoint a guardian ad litem for her at the initial hearing, an error which she argued required setting aside all orders (including the adjudication of dependency) and proceeding again de novo. Mother argued that, since the proceedings should begin again de novo, the minor should be placed with aunt under the relative placement preference.

At the September 25, 2009 hearing, evidence was presented regarding additional visits between minor and the maternal relatives. Although foster parents believed minor was starting to become more comfortable around some of the maternal relatives, they stated that there was no evidence that he could be left with them for more than 30 minutes or that separation from them would not constitute a major trauma. DCFS agreed that minor still needed comforting at the visits and that he "was inconsolable at times." Faced with this evidence, the dependency court decided to appoint an expert for a bonding study.[9] Given that the court would be considering the issue of placement after the bonding study, the court denied the section 388 petitions as "superfluous."

---

[8] DCFS apparently did not consider whether foster parents' expressed commitment to continuing to have minor remain a close part of the maternal family after adoption would ameliorate its concerns regarding his long-term need for identity development.

[9] This decision was over the objection of DCFS and mother, who argued that a study would cause undue delay and that there was no information an evaluator "meeting these people for an hour" could provide that was not already available. The bonding study ultimately prepared was based on more than *14* hours of meetings and contained substantial information beyond that presented by the parties involved. In any event, we are puzzled by DCFS's concern regarding delay. By all accounts, minor was in no emotional condition to be immediately replaced into aunt's custody, yet improvement was seen during the most recent visits. Surely, the additional delay caused by a bonding study would allow for additional visits in which minor could become more comfortable with aunt.

The court appointed Lynda Doi Fick, M.A., M.F.T., to prepare a bonding study. The case was continued to December 10, 2009, for a contested hearing—first on the issue of possible replacement, then the Welfare and Institutions Code section 366.26 hearing. Both mother and aunt appealed from the denial of their Welfare and Institutions Code section 388 petitions.

The bonding study report is 51 pages long, and was based on interviews with the foster parents, aunt, aunt's husband, aunt's father, and child's babysitters. Fick observed the child alone, with the foster parents, with aunt, with aunt's husband, and with aunt's parents.[10] She reviewed the visitation logs, DCFS reports, and other documentation. The report ultimately concluded that the child (1) had a bonded and secure attachment with his foster parents; (2) had an "insecure" attachment to aunt and her husband; and (3) had no attachment at all to the maternal grandparents. According to Fick, the interaction between child and the aunt and her family seemed "unusual given the duration of their visit plan." After speaking with the child's babysitters, as well as making her own observations of the child with her alone, Fick concluded that the child "does . . . have the ability to effectively transfer to others and has exhibited appropriate adaptive skills." However, the child's distress when observed with aunt and her family indicated that "[i]t is likely that [the minor] associates negative experiences with the maternal family's caretaking or distressful events occurring during prior visits. He does not appear to trust their care and will not accept sustained comfort from them." The therapist concluded that the visits with aunt and her family were not frequent and consistent enough to produce a level of trust "required to assume a custodial role." She recommended a visitation plan with frequent and consistent visits—at least three one-hour visits per week. She concluded that, at the time of the report, "it would be detrimental to change [the minor's] placement as he does not demonstrate the necessary adaptive skills or strength in attachments with his family to support an effective custodian exchange. He would potentially experience the loss of the ability to form effective attachment to others later in life if the Court were to interrupt this valuable attachment process. [¶] He has formed insecure and disorganized attachments . . . [to his maternal aunt and her husband]. These attachments do not indicate a readiness for them to assume the role as primary caretakers."

After receiving the report, DCFS continued to recommend replacing the child with the aunt and her family. DCFS believed that the attachment concerns raised by the bonding study could be mitigated by "attachment-based therapy." At the December 10, 2009 hearing, the court ordered that

[10] The minor's bond to the aunt's parents (the child's maternal grandparents) was considered because the aunt had indicated that her parents would take care of the child when she and her husband were at work.

visits with aunt and her family be monitored by foster parents. Because new counsel was appointed for mother, the hearing was continued to January 5, 2010.

At the January 5, 2010 hearing, it came to light that mother had a conservator who is a public guardian represented by county counsel's office. As DCFS was also represented by county counsel, DCFS's attorney declared a conflict, and a conflict attorney was appointed to represent DCFS. Moreover, mother's conservator was not prepared for the hearing. The matter was trailed to January 7 for trial setting, and, at that time, the hearing was again continued to February 2, 2010.

By the February 2, 2010 hearing, two full months had passed since Fick's report. Although three visits per week had been recommended, aunt had visited minor only three times in total. No arrangements had been made for the attachment-based therapy recommended by DCFS.

*On the day of the February 2, 2010 hearing,* mother's attorney filed a motion requesting a 30-day continuance on the basis that mother was in the process of formally relinquishing the minor to DCFS for adoption; the process was not yet complete because, as mother was under a conservatorship, court approval was required. The foster parents objected to the continuance, as an attempt to make an "end run" around the child's rights and preclude the termination hearing from occurring as scheduled. The court granted the continuance on the basis that this hearing was the "first time we have noticed public counsel," and indicated the Welfare and Institutions Code section 366.26 hearing would go ahead on March 9, 2010, if the relinquishment efforts were not final at that time. It is this grant of a continuance that is challenged by minor in his appeal.

A relinquishment of parental rights is not final until a certified copy of the relinquishment is filed with the State Department of Social Services (SDSS), and 10 business days have passed or SDSS sends written acknowledgement of receipt of relinquishment. (Fam. Code, § 8700, subd. (e)(1).) In this case, mother raced to meet the March 9, 2010 deadline. On March 1, 2010, mother's psychologist determined that mother has "the requisite mental capacity to understand, appreciate, reason, and articulate her consent to signing a voluntary relinquishment of parental rights." He believed she has the ability to "understand the nature, content, and effect of signing a consent to adoption." Mother's psychiatrist agreed that mother "understands and correctly perceives her familial relationships and fervently desires her son to be adopted by her sister." On March 3, 2010, the Mental Health Courthouse of the Los Angeles Superior Court authorized mother to consent to the voluntary relinquishment of the minor. Thereafter, mother signed a relinquishment of parental rights, designating aunt as the person with whom she

intended minor to be placed for adoption. The relinquishment was transmitted to SDSS, but 10 business days had not yet passed, nor had written acknowledgement of receipt been received.

Thus, when the dependency court called the hearing on March 9, 2010, the relinquishment was not yet final. The court therefore proceeded with the hearing.[11] Mother's attorney indicated his intent to call Fick as a witness; as Fick was in transit, the court ordered a recess. During the recess, the court received a facsimile transmittal of the receipt of the relinquishment from SDSS.

Upon receipt of the facsimile from SDSS, the court terminated the hearing. Counsel for the foster parents and minor argued that although the relinquishment foreclosed a hearing to terminate mother's parental rights, the court should still proceed on the issue of whether replacing minor into aunt's home was against the child's best interests. The court disagreed, concluding that it no longer had jurisdiction over that determination, because mother had voluntarily relinquished her parental rights. The court stated that the minor "is going to have to be placed with the aunt," and lifted its previous "do not remove" order. The foster parents and minor appealed from that order.

We consolidated these appeals with the appeals of mother and aunt from the denial of their Welfare and Institutions Code section 388 petitions. We issued an order granting a writ of supersedeas, directing that the minor not be moved from his placement with foster parents pending finality of this appeal or further order of this court.

### ISSUES ON APPEAL

We first consider the denial of aunt's Welfare and Institutions Code section 388 petition; we conclude that summary denial of the petition when the issue it raised (replacement) was to be considered at the next hearing, following receipt of the bonding study, was not an abuse of discretion. Second, we consider the denial of mother's Welfare and Institutions Code section 388 petition. On appeal, mother argues only that a guardian ad litem should have been appointed for her at the commencement of proceedings; we conclude this is not a proper basis for a Welfare and Institutions Code section 388 petition and, in any event, conclude the trial court did not err. Third, we consider the minor's appeal of the court's order continuing the Welfare and Institutions Code section 366.26 hearing—an order which enabled mother to

---

[11] The parties dispute whether the court commenced the Welfare and Institutions Code section 366.26 hearing at this point. The court had previously indicated that it would consider the replacement issue prior to holding the Welfare and Institutions Code section 366.26 hearing.

timely file a relinquishment of parental rights. Under the circumstances, we conclude the grant of the untimely continuance motion was an abuse of discretion. Finally, we consider foster parents' and minor's appeals from the order declining to hold a hearing on the replacement issue after receipt of acknowledgment of the relinquishment. As conceded by virtually all parties, this constituted error.

### DISCUSSION

1. *Denial of the Maternal Aunt's Section 388 Petition Was Not an Abuse of Discretion*

We review a denial of a Welfare and Institutions Code section 388 petition for abuse of discretion. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460 [118 Cal.Rptr.2d 482].) Section 388 provides, in pertinent part: "(a) Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made . . . . The petition . . . shall set forth in concise language any change of circumstance or new evidence that are alleged to require the change of order . . . . [¶] . . . [¶] (d) If it appears that the best interests of the child may be promoted by the proposed change of order, . . . the court shall order that a hearing be held and shall give prior notice, or cause prior notice to be given [to the parties]." Section 388 petitions "are to be liberally construed in favor of granting a hearing to consider the [petitioner]'s request. [Citations.] The [petitioner] need only make a prima facie showing to trigger the right to proceed by way of a full hearing." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309–310 [19 Cal.Rptr.2d 544, 851 P.2d 826].) "A 'prima facie' showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593 [50 Cal.Rptr.2d 745].) "Whether [the petitioner] made a prima facie showing entitling [the petitioner] to a hearing depends on the facts alleged in [the] petition, as well as the facts established as without dispute by the [dependency] court's own file . . . ." (*In re Angel B., supra*, 97 Cal.App.4th at p. 461.)

In this case, aunt had been located in May 2009, and started visiting with the minor sporadically at that time. DCFS expressly indicated its goal was to replace the minor with the aunt as a prospective adoptive parent. In June 2009, the court ordered that the child not be removed from his current placement without a hearing. By late August 2009, evidence began to surface suggesting that moving the child to aunt's home would not be in his best interests. The court indicated that replacement would be considered at the

September 25, 2009 hearing. Prior to that hearing, aunt filed her Welfare and Institutions Code section 388 petition, seeking replacement of the child with her. The petition can only be described as superfluous; the petition sought a hearing on the very issue the court had already indicated would be considered at a hearing that had already been scheduled. At that time, however, the court continued the hearing, in order to have a bonding study performed.

The trial court did not abuse its discretion in summarily denying aunt's petition. The same result would have occurred had the court set the petition for a hearing, but requested that a bonding study be completed prior to the hearing. There was evidence before the court that the child cried inconsolably when with the aunt and experienced night terrors after visits. That the court sought preparation of a bonding study before considering replacement with the aunt when faced with this evidence was not an abuse of discretion; instead, it was the act of a court properly considering the child's best interests.[12]

### 2. Denial of Mother's Section 388 Petition Was Not an Abuse of Discretion

Mother argues that the summary denial of her Welfare and Institutions Code section 388 petition constituted an abuse of discretion. Mother goes on to argue that the trial court erred in not appointing a guardian ad litem for her at the detention hearing.

Initially, we believe a Welfare and Institutions Code section 388 petition cannot be used to challenge the court's failure to appoint a guardian ad litem in this manner. Mother's argument for a modification of the placement order is not based on a change of circumstances or new evidence. Instead, mother argues that *if* a guardian ad litem *had been* appointed, "it is plausible" that a guardian ad litem experienced in dealing with individuals with mental disorders would have been able to elicit from her information regarding her family, thus "it is more than likely" that her relatives would have been located at the start of the case, and therefore minor would have been placed with them from the beginning.[13] Even if every link in this causal chain were well supported, the argument would not justify the relief mother sought: placement of the minor with aunt. Welfare and Institutions Code section 388

---

[12] We note that aunt's brief on appeal mentions the order for completion of a bonding study only once, in its discussion of the factual and procedural history. Aunt does not discuss how the court's order of such a study before considering the replacement issue could possibly amount to an abuse of discretion.

[13] Welfare and Institutions Code section 361.3, subdivision (a) provides that when a child is removed from parental custody, preferential consideration shall be given to placement with an appropriate relative.

provides for a modification of an order based on a change of circumstances or new evidence and the best interests of the child, not a modification of an order based on what *would have* happened had the court made a different order one year earlier. In other words, even if the court had erred in failing to appoint a guardian ad litem for mother at the detention hearing, that error would not justify placing the minor with his aunt.

In any event, mother failed to establish a prima facie case that the trial court had been required to appoint a guardian ad litem for her at the time of the detention hearing. Under Code of Civil Procedure section 372, a parent who is mentally incompetent must have a guardian ad litem appointed.[14] Mother did not support her Welfare and Institutions Code section 388 petition with any expert declarations or medical records indicating that she was mentally incompetent and required a guardian ad litem.[15] In her reply brief on appeal, she simply argues that the court "was well aware of mother's mental condition and knew or should have known she was incapable of participating in the case in any meaningful way." We disagree. At the detention hearing, the court expressed concern regarding mother's muteness, and indicated an intent to address the issue of possible appointment of a guardian ad litem at the next hearing. Mother, however, disappeared prior to this hearing, so her mental condition could not be further evaluated. The court's chosen procedure was not erroneous. Thus, mother wholly failed to establish any basis on which the court may have erred in failing to appoint a guardian ad litem, justifying the court's summary denial of her Welfare and Institutions Code section 388 petition.

### 3. *The Dependency Court Abused Its Discretion When It Granted a Continuance on February 2, 2010*

Welfare and Institutions Code section 352, subdivision (a) provides that if it is not contrary to the interests of the minor child, a trial court may grant a continuance in a dependency case for good cause shown, for the period of time shown to be necessary, and further provides that when considering whether to grant a continuance the court "shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." The trial court's ruling on

[14] A mentally incompetent individual may also appear by a conservator. It was subsequently disclosed that mother had a conservator at the time of the detention hearing. However, as the court was not advised of this fact, mother limits her argument to the failure to appoint a guardian ad litem.

[15] Indeed, in connection with her relinquishment of parental rights, mother subsequently submitted expert testimony that she possessed "the requisite mental capacity to understand, appreciate, reason, and articulate her consent to signing a voluntary relinquishment of parental rights" and that she "understands and correctly perceives her familial relationships."

whether a request for a continuance came within those guidelines is reviewed for abuse of discretion. (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 585 [25 Cal.Rptr.3d 774].)

In order to obtain a continuance of a hearing, written notice shall be filed at least two court days prior to the date set for the hearing, "unless the court for good cause entertains an oral motion for continuance." (Welf. & Inst. Code, § 352, subd. (a).) Moreover, the motion shall be served on the parties at least two court days before the date set for the hearing. (Cal. Rules of Court, rule 5.550(a)(4).) In this case, mother's February 2, 2010 motion for a continuance was neither filed nor served two days prior to the date set for the hearing. Thus, the motion was untimely, and could only have been "entertain[ed]" if there was good cause for the last-minute oral motion. As we discuss below, there was neither good cause for the untimely motion, nor for the continuance itself.

We consider the relevant chronology in some detail. The Welfare and Institutions Code section 366.26 hearing was initially set for August 28, 2009, and subsequently continued to December 10, 2009, to allow a bonding study to be completed. As new counsel had been appointed for mother, the hearing was again continued to January 5, 2010.

Mother's attorney concedes that, on December 10, 2009, she learned the identity of mother's public guardian conservator. However, mother's counsel did not speak to the conservator until December 30, 2009. Immediately thereafter, mother's counsel forwarded the relevant documents from the case file to the conservator. This included notice of the January 5, 2010 hearing.

At the January 5, 2010 hearing, the court was made aware of the conservator. The court again continued the proceedings—both because counsel for DCFS declared a conflict and because the conservator was not prepared. The matter was continued to January 7, 2010, for trial setting.

Mother's attorney spoke with the conservator on January 5, 2010, at which time the conservator refused to communicate with mother's counsel without the advice of (conservator's) counsel. On January 7, 2010, the matter was set for hearing on February 2, 2010. On January 14, 2010, the conservator was served with a "Citation to Appear" for the February 2, 2010 hearing. On February 1, 2010, the conservator informed mother's counsel of mother's wishes to file a relinquishment of parental rights. On February 2, 2010, the day of the hearing, mother's attorney filed and served the request for continuance.

It is clear that, by mid-January 2010, the conservator had been given the necessary documents from the dependency case, and was aware that the

hearing was set for February 2, 2010. There is simply no reason why a motion for a continuance of that hearing could not have been timely filed and served two court days prior to the hearing. Indeed, mother does not offer any reason on appeal. Thus, there was no good cause for an untimely motion for continuance, and the court should not have entertained it.

■ Moreover, it was clear to the trial court, and all involved, that the continuance was not sought because the conservator was *unprepared* for the hearing. Instead, the continuance was sought to enable mother to complete her voluntary relinquishment of parental rights in favor of the aunt. As we will discuss in greater detail below, the law is clear that when a voluntary relinquishment becomes final before the Welfare and Institutions Code section 366.26 hearing, the relinquishment precludes the court from proceeding with the hearing. (*In re R.S., supra,* 179 Cal.App.4th at p. 1152.) We hold, however, that it is *not* within a child's best interests to continue an already much-delayed Welfare and Institutions Code section 366.26 hearing in order to enable a parent to complete a last-minute "end-run" around an anticipated termination of parental rights.

Had mother not obtained a continuance and the hearing went ahead, the trial court would have first considered whether it was in the minor's best interests to replace him into aunt's home. Then, the court would have held the Welfare and Institutions Code section 366.26 hearing, determining whether mother's parental rights should be terminated.[16] In other words, both the temporary placement of the minor and the termination of mother's parental rights—issues which been awaiting adjudication for more than five months—would have been resolved, with the best interests of the minor being the touchstone of each determination. (Welf. & Inst. Code, §§ 366.26, subd. (h)(1), 388, subd. (d).) Indeed, the mother's interest in the child's placement would have been "legally irrelevant." (*Los Angeles County Dept. of Children etc. Services v. Superior Court* (1998) 62 Cal.App.4th 1, 11 [72 Cal.Rptr.2d 369].)

Instead, however, the continuance was granted, which postponed the Welfare and Institutions Code section 366.26 hearing until such time as mother could foreclose it by relinquishing parental rights, by means of a designated relinquishment which gave weight to *mother's interest* in placing the child with aunt—a decision which may well have been motivated, not by her evaluation of the child's best interests, but instead by the fact that placing the child with aunt would guarantee her continued contact with the child, and perhaps even enable her to raise him.

---

[16] Assuming the court terminated parental rights, a matter which was not seriously in dispute, the court, if it had not already decided to place the child with aunt, would have been required to consider whether to designate the foster parents as prospective adoptive parents. (Welf. & Inst. Code, § 366.26, subd. (n).)

Again, we have no quarrel with the proposition that a parent may voluntarily relinquish parental rights and thereby prevent the dependency court from proceeding with an involuntary termination. However, the dependency court need not grant a continuance in order to enable the parent to complete a pending relinquishment. In a case such as this, where (1) the hearing had been continued multiple times; (2) the parent intended to complete a relinquishment of parental rights designating adoptive custody to go to a relative; and (3) substantial questions had been raised as to whether placing the child with the relative was in the child's best interests, granting the continuance was *not* in the child's best interests, and therefore constituted an abuse of discretion.

### 4. *The Trial Court Erred in Lifting the "Do Not Remove" Order Without Considering the Child's Best Interests*

The parties do not seriously dispute that the trial court erred by lifting its "do not remove" order, thereby allowing the child to be placed with aunt, without considering the child's best interests.[17] However, we discuss the issue in some detail to provide guidance to the dependency court on remand.

■ Welfare and Institutions Code section 361, subdivision (a) provides that when a minor is adjudged dependent, the court may limit the control to be exercised over the child by the parent. However, these limitations do "not limit the ability of a parent to voluntarily relinquish his or her child to . . . a licensed county adoption agency at any time while the child is a dependent child of the juvenile court . . . ." (Welf. & Inst. Code, § 361, subd. (b).) Family Code section 8700, in turn, provides that either parent may relinquish a child to a licensed adoption agency.[18] Subdivision (f) of Family Code section 8700 provides that "[t]he relinquishing parent may name in the relinquishment the person or persons with whom he or she intends that placement of the child for adoption be made by the . . . licensed adoption agency."

Although the Family Code provides for a so-called designated relinquishment, it does not specify the weight to be given to a parent's designation. It is clear that a designated relinquishment will not always result in the child's being placed for adoption in the home of the designated adoptive parent, or eventual adoption by said individual. Indeed, the law provides that if the child "is not placed in the home of the named person . . . or the child is removed from the home prior to the granting of the adoption," the relinquishing parent shall be given notice of that decision and given 30 days within

---

[17] In their respondents' brief on appeal, mother and aunt agree that the court should have reviewed the decision to place minor with aunt. DCFS filed a letter joining in their brief, but taking the position that any error in failing to make that determination was harmless.

[18] It is undisputed that DCFS is a licensed adoption agency.

which to *rescind* the relinquishment.[19] (Fam. Code, § 8700, subds. (g) & (h).) Thus, the Legislature understood that a designated relinquishment would not *necessarily* result in the child's adoption by the individuals designated. However, the scope of the adoption agency's discretion to choose where to place the child who is the subject of a designated relinquishment, and the court's power to review such a decision, is not set forth in the statutes.

■ When a child has been freed for adoption by relinquishment, the licensed adoption agency "is entitled to the exclusive custody and control of the child until an order of adoption is granted." (Fam. Code, § 8704, subd. (a).) As to placement of the child, Family Code section 8710, subdivision (a) provides that "[i]f a child is being considered for adoption, the department or licensed adoption agency shall first consider adoptive placement in the home of a relative . . . ." The statute goes on to provide that "if placement with an available relative is not in the child's best interest . . . , the foster parent or parents of the child shall be considered with respect to the child along with all other prospective adoptive parents where" certain conditions are present.[20] The statute provides no guidance as to whether its placement preference provisions are to be considered in a case of a *designated* relinquishment, or the extent of any court review[21] of an agency's placement decision.[22]

We can, however, draw an analogy to dependency proceedings. The language of Family Code section 8704, subdivision (a), which provides that the licensed adoption agency to which a child has been freed for adoption "is

---

[19] For this reason, when a designated relinquishment precedes a hearing to terminate parental rights under Welfare and Institutions Code section 366.26, the appropriate process is to *vacate* the hearing, but not *terminate* dependency proceedings. If the child is not placed with the individuals designated in the relinquishment, and the parent chooses to rescind the relinquishment, the Welfare and Institutions Code section 366.26 hearing should proceed.

[20] The conditions are: "(1) The child has been in foster care with the foster parent or parents for a period of more than four months. [¶] (2) The child has substantial emotional ties to the foster parent or parents. [¶] (3) The child's removal from the foster home would be seriously detrimental to the child's well-being. [¶] (4) The foster parent or parents have made a written request to be considered to adopt the child." Foster parents certainly have an argument that all of these conditions are met in this case.

[21] An adverse agency decision may be challenged by a grievance. (Cal. Code Regs., tit. 22, § 35215.) A hearing must be held and the agency director shall issue a written decision with specific findings. (Cal. Code Regs., tit. 22, §§ 35219, 35221.) Presumably, court review is available by means of petition for writ of administrative mandate. (Code Civ. Proc., § 1094.5.)

[22] Subdivision (c) of Family Code section 8710 provides: "This section does not apply to a child who has been adjudged a dependent of the juvenile court pursuant to Section 300 of the Welfare and Institutions Code." While the legislative history of this language is somewhat complex, our review of that history establishes that this language was inserted because it was understood that children adjudged dependent would be protected by the adoption placement preferences set forth in the Welfare and Institutions Code, particularly Welfare and Institutions Code section 366.26. As a voluntary relinquishment results in vacation of a Welfare and

entitled to the exclusive custody and control of the child until an order of adoption is granted," applies not only to relinquishments, but also when a child has been freed for adoption by termination of parental rights. The question has arisen as to whether the agency's "exclusive" custody and control was nonetheless subject to court review. Cases determined that the agency's jurisdiction was not "unfettered," and that the dependency court could nonetheless review an agency's exercise of discretion regarding post-termination placement.[23] (*Fresno County Dept. of Children & Family Services v.*

---

Institutions Code section 366.26 hearing and the suspension of further dependency proceedings, we conclude that this language was not meant to apply to a child who was *initially* adjudged dependent, but whose placement is determined by the Family Code due to a voluntary relinquishment.

The language was originally added to Civil Code former section 224n. Civil Code former section 224n initially provided that a licensed adoption agency to which a child was relinquished for adoption had exclusive custody and control of the child—the same language currently found in Family Code section 8704. It also provided, in language similar to the foster parent language currently found in Family Code section 8710, that if a child had been in foster care for more than four months, the child had substantial emotional ties to the foster parents, removal would be seriously detrimental to the child's well-being, and the foster parents were interested in adoption, the foster parents should be considered along with all other prospective adoptive families. Civil Code former section 224n also provided, however, that the placement decisions of the licensed adoption agency shall be presumed to be in the best interests of the child and that the presumption may be rebutted in an action filed by the foster parents, establishing by a preponderance of the evidence that they met the criteria set forth above. In 1990, the subdivision of Civil Code former section 224n which provided for foster parent consideration *and* for the foster parents to challenge the decision by court action, was amended to state, "This subdivision does not apply to a child who has been adjudged to be a dependent of the juvenile court pursuant to Section 300 of the Welfare and Institutions Code." (Stats. 1990, ch. 130, § 1, pp. 1142–1143.) The Assembly Committee on Judiciary Republican caucus analysis explains the purpose of the amendment as follows: "The sponsor states that this bill would eliminate confusion over court jurisdiction for dependent children in adoptive placement matters and would result in avoidance of potentially significant costs. The author previously carried SB 1177 which provided for adoption preference for foster parents who seek to adopt a child whose parents have relinquished parental rights to an adoption agency under the jurisdiction of superior courts. This bill clarifies that the preferences stated in SB 1177 were not meant to super[s]ede other existing law provisions for preference of a child who is under the jurisdiction of the juvenile court (being removed from parents for physical abuse or neglect) rather than that of the superior court for agency adoptions." (Assem. Republican Caucus, Analysis of Sen. Bill No. 2188 (1989–1990 Reg. Sess.) May 21, 1990.) While this language was subsequently moved (in turn) to Civil Code former section 222.20, Family Code former section 8711, and ultimately Family Code section 8710, the rationale for the language remains the same. The Legislature intended to exempt dependent children from the preferences in Family Code section 8710 because they were otherwise protected by the preferences in dependency law. When a dependent child is no longer protected by dependency law due to a voluntary relinquishment, there is no reason Family Code section 8710 should not apply.

[23] We recognize that the analysis in these dependency cases relied on the premise that under Welfare and Institutions Code section 366.3, subdivision (a), a dependency court retains jurisdiction over the child after termination of parental rights until the child is adopted. There is no similar provision in the Family Code regarding a child for whom a relinquishment has

*Superior Court* (2004) 122 Cal.App.4th 626, 649–650 [19 Cal.Rptr.3d 155].) The courts could overrule an agency's posttermination placement decision if it was patently absurd or unquestionably not in the child's best interests.[24] (*In re Harry N.* (2001) 93 Cal.App.4th 1378, 1397 & fn. 20 [114 Cal.Rptr.2d 46]; *Department of Social Services v. Superior Court* (1997) 58 Cal.App.4th 721, 724–725 [68 Cal.Rptr.2d 239].)

■ Subsequently, the Legislature concluded that this limited oversight was not sufficient. Welfare and Institutions Code section 366.26 was amended to include subdivision (n), which provides that, "(1) [n]otwithstanding Section 8704 of the Family Code [that is, notwithstanding the adoption agency's exclusive custody or control of a child after the termination of parental rights], the court, at a [Welfare and Institutions Code section 366.26] hearing . . . or anytime thereafter, may designate a current caretaker as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process." The legislative history of this subdivision indicates that it was intended to expand the court's oversight of a child's placement after parental rights have been terminated. (*Wayne F. v. Superior Court* (2006) 145 Cal.App.4th 1331, 1337–1339 [52 Cal.Rptr.3d 519].) "[I]n enacting subdivision (n) the Legislature intended that following termination of parental rights the juvenile court, rather than any social services or adoption agency, will determine whether a child should be removed from a home in which the child ha[s] been for at least six months and that removal may be ordered only if it is in the best interest of the child." (*Id.* at p. 1341.) However, this language applies only *at* or *after* a Welfare and Institutions Code section 366.26 hearing. When a voluntary relinquishment precludes a court from proceeding with the Welfare and Institutions Code section 366.26 hearing, the court has no authority to designate a current caretaker as a prospective adoptive parent. (*In re R.S., supra,* 179 Cal.App.4th at pp. 1153–1154.) Nonetheless, the court still retains its limited authority to disapprove an agency placement decision if the agency's decision is patently absurd or unquestionably not in the minor's best interests. (*Id.* at p. 1150.)

been filed; this is likely due to the fact that, in many relinquishment cases, no court's jurisdiction is invoked until such time as a petition for adoption is filed. (After such a petition is filed, the agency may not move the child without court approval. (Fam. Code, § 8704, subd. (b).)) In the instant case, however, there can be no dispute that the dependency court has jurisdiction over the child.

[24] Moreover, if the agency has expressed an intent to place the child in a situation that is unquestionably not in the child's best interests, the court may issue a "do not remove" order precluding the agency from moving the child unless it first has made a showing that to do so "would not necessarily be a gross violation of its discretion." (*Fresno County Dept. of Children & Family Services v. Superior Court, supra,* 122 Cal.App.4th at pp. 640–641, 650.)

■ In this case, the trial court erred in not considering whether placement with the child's aunt—as designated by mother and intended by DCFS—was patently absurd or unquestionably not in the child's best interests. DCFS suggests that any error in this regard was harmless, as there "is no evidence or can . . . be no viable argument made" that this decision was patently absurd or unquestionably not in the child's best interests. We disagree. While the issue is one for the trial court to address, we note the following: (1) aunt's prebonding study visitation with minor was sporadic; (2) while minor apparently possessed the skills to transfer to others, he continually exhibited distress while with aunt and did not appear to trust her care; (3) the bonding study concluded that "it would be detrimental" to change minor's placement to aunt, as minor had formed only an insecure attachment to her; (4) although the bonding study recommended frequent and consistent visits, aunt visited only three times in the following two months; (5) although DCFS believed the bonding study's concerns could be ameliorated through attachment-based therapy, it did not arrange for such therapy; and (6) there was evidence that aunt did not truly want custody, and expressed the wish that she had never been located. Most disturbing is the fact that there was evidence that aunt did not intend to parent minor herself, but instead indicated an intent to allow mother to raise minor. The idea that this designated relinquishment was merely a ruse to avoid termination of mother's parental rights and to allow mother to raise the minor, although aunt would legally adopt him, cries out for investigation. Such a situation would unquestionably not be in the child's best interests.

While the trial court erred in not considering whether placement with aunt would unquestionably not be in the child's best interests, we are not blind to the fact that significant time has elapsed. Circumstances may well have changed. Certainly, if aunt has visited frequently and consistently, and if aunt and minor have engaged in attachment-based therapy, the child may have established a secure, bonded relationship with aunt. It may also be that aunt continued to visit only sporadically and failed to establish a bond with minor. We are most concerned with the best interests of this child. Thus, while we reverse and remand for further proceedings in the dependency court,[25] we

_____

[25] All parties acknowledge that, on remand, the parental rights of minor's unknown father must be terminated. Foster parents suggest that father's parental rights should be terminated pursuant to Welfare and Institutions Code section 366.26, thus enabling the court to designate them as prospective adoptive parents under Welfare and Institutions Code section 366.26, subdivision (n). We disagree; we do not believe that the issue of whether the provisions of Welfare and Institutions Code section 366.26, subdivision (n) apply in the case of a designated relinquishment should turn on the circumstance of whether the child has an unknown father whose parental rights must be terminated. Moreover, we note that California Rules of Court, rule 5.725(a)(2) provides that the court may not terminate the rights of only one parent under Welfare and Institutions Code section 366.26, unless certain circumstances exist, one of which is that "the other parent has relinquished custody of the child to the welfare department."

emphasize that in determining whether DCFS's expressed intent of placing minor with aunt is patently absurd or unquestionably not in his best interests, the court may consider circumstances that have arisen since the filing of these appeals.

## *DISPOSITION*

The orders (B219979) from which Mother and the maternal aunt have appealed are affirmed. The orders (B223063) from which B.C. and his de facto parents have appealed are reversed and the cause is remanded for further proceedings consistent with the views expressed herein.

Kitching, J., and Aldrich, J., concurred.

---

While this exception would technically apply here, we note that mother's relinquishment of custody would be subject to rescission if the court concludes that placement with the aunt is unquestionably not in the child's best interests. Thus, it appears preferable that the court first make this latter determination, before it turns its attention to the termination of father's parental rights.