Filed 9/25/13  In re C.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.C., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>T.O.,<br><br>        Defendant and Appellant. | E058068<br><br>(Super.Ct.No. J240264)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Adam E. Ebright, Deputy County Counsel, for Plaintiff and Respondent.

1

T.O. appeals an order terminating her parental rights and placing her son, C.C., for adoption. She contends that the juvenile court mistakenly believed it had no alternative but to place the child for adoption and that it should have continued the termination hearing to determine whether further services would enable her to reunite with her son.

We will affirm the judgment.

<u>BACKGROUND</u>

T.O. (sometimes referred to as mother) is developmentally disabled, with an IQ of 61 to 69. T.O. and C.C. lived with T.O.'s mother and brother, both of whom are also developmentally disabled. The maternal grandmother also had physical disabilities. The family's only source of income was apparently SSI. C.C.'s father, J.C., who lived with his mother, visited frequently during the week and helped care for C.C. C.C. normally stayed at the father's house on weekends. J.C. was diagnosed with autism, ADD and Tourette syndrome. He was unemployed and receiving SSI benefits, but was enrolled in a community college, studying mechanics in a vocational program.[1]

On August 6, 2011, when C.C. was two, the Department of Children and Family Services (CFS) responded to a referral alleging neglect and physical abuse of C.C. and parental mental health issues. The referral stated that C.C. had bruising up and down his body in various stages of healing, and the social worker confirmed that the injuries were consistent with abuse. The social worker observed that the home was "in disarray" and that the crib was full of junk, including a blanket with dog excrement on it. Mother

_____

[1] The father is not a party to this appeal.

2

stated that she and C.C. slept on a mattress in the living room. The mattress was leaning against the wall and was dirty.

When the social worker asked to check the kitchen for food, the maternal grandmother refused, saying that they had no food and were just about to go shopping. The maternal grandmother stated that the home was usually immaculate, but the deputy who served the detention warrant told the social worker that he had been called to the home numerous times and that the home was usually a mess.

That morning, the father had seen the maternal uncle become irate when C.C. would not come to him. He reported that the maternal uncle had been physically assaultive with him and with T.O. He stated that the maternal grandmother, who was in charge of the family's finances, would mismanage the family's money and they would run out of food. He said that mother would often tell him in the afternoon that C.C. had not eaten yet.

The maternal grandmother denied that she had any knowledge of the bruising on C.C.'s body before the social worker told her about it. The maternal grandmother blamed the injuries on the father, saying that he had taken C.C. for a walk and was gone a long time. The maternal grandmother also stated that the father had kicked T.O. in the head the day before the referral. T.O. confirmed that the father had kicked her and that he also hit her. T.O. was also "reported" to have hit the father. (The source of this report is not disclosed.)

3

After C.C. was detained, he was examined by a doctor who stated that his injuries were the result of abuse and that he was also neglected, based on an "inordinate amount" of plaque on his teeth.

A petition pursuant to Welfare and Institutions Code section 300[2] was filed on August 15, 2011. The petition alleged that C.C. had suffered physical abuse while in the custody of both parents. It also alleged that both parents had failed to protect him from physical abuse and that C.C. was at risk of injury because of the parents' mutual domestic violence. The petition also alleged that both parents had developmental disabilities which impaired their ability to parent C.C. and that mother had failed to provide an appropriate residence for C.C.

C.C. was ordered detained and was placed with his paternal aunt and uncle. J.C. wanted custody of C.C., but was willing to allow his sister to have custody because he wanted his son to be safe. The social worker observed during supervised visits between C.C. and his parents that he appeared to be bonded to both parents. CFS recommended reunification services for both parents.

At the jurisdiction/disposition hearing, the court found all of the allegations true and ordered reunification services for both parents.

In the report prepared for the six-month review hearing, the social worker recommended an additional six months of reunification services but stated that she was waiting for the court to approve a psychological evaluation of both parents in order to

---

[2] All further statutory citations refer to the Welfare and Institutions Code unless another code is specified.

4

determine their level of functioning and the services which would assist them with reunification. She reported that both parents had completed a parenting course but that it was uncertain whether the parents had absorbed the training they had received. Both parents had been consistent with visitation, both were cooperative, and both interacted well with C.C. The foster mother, C.C.'s paternal aunt, ensured that C.C. visited with "other important individuals in the family." She was supportive of reunification but was also open to adopting C.C. if reunification failed. She and C.C. had a strong bond, and he went to her for his wants and needs. Her home had been approved by the Relative Approval Unit.

At the six-month review hearing, the attorney for CFS asked the court to order psychological evaluations, which CFS had denied for budgetary reasons, and told the court that although the parents had been participating in services, there had been no benefit, and the evaluations were necessary in order to determine what services might benefit the parents. The parents asserted that reasonable services had not been provided. The foster mother informed the court that the social worker had not been in contact with her or with the father. The court noted that it had already ordered the psychological evaluations. It continued the review for a contested hearing on whether reasonable services had been provided.

On April 2, 2012, the court found that reasonable services had not been provided. The attorney for CFS stated that upon receipt of the court's order, she would provide it to management to facilitate the provision of the psychological evaluations. Counsel for mother reported that mother had sought out individual counseling on her own. The court

5

ordered the parents to continue to participate in reunification services and increased visitation to twice a week for two hours.

For the 12-month status review hearing, CFS recommended terminating reunification services and setting a section 366.26 hearing with a permanent plan of adoption. The social worker reported that the parents both loved their son and wanted only the best for him, but that because of the lack of progress they had made in reunification services, C.C. would not be safe if left alone with either parent. Her opinion was based in large part on the psychological evaluations. As to mother,[3] the evaluation placed her IQ at 64, or borderline mental retardation. Her ability to absorb and retain information was poor. The evaluator reported that she would not be capable of adequately managing the needs of a young child without assistance. She also appeared to perceive her child's needs as excessive and possibly to feel overwhelmed with the responsibilities of being a parent.

The social worker also reported that mother remained dependent on her mother to remind her to attend appointments and to provide transportation, and to "provide her direction and assistance with her daily living." She did not appear to be able to make her own decisions or act responsibly as an adult, and her family members continued to "minimize and deflect blame and responsibility." Living in that household would place C.C. at risk because mother lived in "an environment in which there is a lack of

---

[3] Because the father is not a party to this appeal, we need not recount the details of his psychological evaluation.

responsibility and lack of growth toward alleviating the circumstances" which had necessitated the removal of C.C.

The foster parents remained committed to ensuring that C.C. would have a life-long relationship with his parents.

At the hearing on September 26, 2012, the court found that reasonable services had been provided but that the parents had made minimal progress toward alleviating or mitigating the causes which necessitated placement. The court terminated reunification services and set a section 366.26 hearing. Mother was notified of her writ rights and filed a notice of intent to file a writ petition. She later withdrew her intent.[4] At the hearing, the father stated that he agreed with the social worker's recommendations.

On February 7, 2013, following a hearing, the court denied mother's petition for modification pursuant to section 388 and terminated parental rights as to both parents. (We discuss this hearing in more detail below.) Mother filed a timely notice of appeal.

## DISCUSSION

THE JUVENILE COURT DID NOT MISUNDERSTAND THE SCOPE OF ITS

DISCRETION, AND IT HAD NO SUA SPONTE DUTY TO CONTINUE THE

SECTION 366.26 HEARING

Mother contends that the juvenile court's comments at the section 366.26 hearing reveal that the court mistakenly believed that it had no alternative but to free C.C. for

---

[4] We take judicial notice that mother filed a notice of intent to file a writ petition following the order setting the section 366.26 hearing but later withdrew it. (*T.O. v. Superior Court*, E057202, dismissed Oct. 26, 2012; Evid. Code, § 452, subd. (d).)

7

adoption. She contends that the court could, and should, have continued the hearing in order to assess whether services offered through Inland Regional Center (IRC) would have enabled her to reunite with C.C. We disagree.

The issue arose as follows. On the date set for the section 366.26 hearing, after a one-day continuance, mother filed a section 388 petition requesting additional reunification services. She alleged as changed circumstances the fact that she had obtained her own apartment and had applied for IRC services. Mother's attorney acknowledged that he did not believe that the petition would be granted, but he requested a continuance so that the social worker could make a more current assessment of whether mother could function on her own. The court observed that there did not appear to be any changes in the circumstances that had prevented reunification, but nevertheless granted the continuance and directed the social worker to assess mother's current situation. The court set February 7, 2013, for the continued section 366.26 hearing and the hearing on the section 388 petition.

In her response to the section 388 petition, the social worker reported that she had visited mother's two-bedroom apartment and found it to be appropriately furnished. Mother stated that she used Christmas money she received from her uncle to rent the apartment. Her monthly rent was $600, and her monthly SSI income was about $800. She hoped that the IRC would provide some financial assistance.

The social worker reported that mother appeared to have many misconceptions about her case. Mother stated that she planned to register C.C. for school and believed that she was about to begin having in-home visits with him. The social worker also noted

that by moving out of her mother's house, mother had eliminated the only support system she had. This contravened the recommendation of the psychological evaluation and demonstrated that mother had not benefitted from the services she had received. The social worker observed that mother's disability continued to hinder her ability to provide an appropriate home for C.C. and concluded that adoption continued to be in C.C.'s best interest.

At the combined section 388 and section 366.26 hearing, the court asked whether guardianship would be a better outcome, despite the statutory preference for adoption, because of the "extenuating circumstances" present in this case. Counsel for the minor responded that sometimes "we do the guardianship either because the caretaker wants to preserve the parents' rights . . . and they don't want to change their family's structure in that way, or they would like to leave the door open for a change in custody at some time in the future." The attorney went on to state that in this case, "the relative [caregiver] is committed to keeping the mother involved . . . [a]nd I think that's the best of both worlds for [C.C.]" Mother's attorney then argued that mother's parental rights should not be terminated "simply because she was born with a disability." He did not ask the court to continue the hearing to allow time to determine whether IRC would provide services which might enable mother to reunify with C.C.

At that point, the court made the comments mother criticizes. The court stated, "The real question is, given the statutory scheme, the way it's set up, essentially, it is the caretaker's choice, because if the caretaker is willing to adopt, the law is that I'm supposed to do adoption. [¶] And I hesitated last time to make sure that that was flushed

9

out [*sic*] and the people knew what we were doing and had a chance to come up with the differences. [¶] And the current circumstances are that the caretakers want to adopt. So how do I not do this with these facts?" After further comments by counsel for mother and counsel for CFS—again not including a request by mother's counsel for a continuance—the court denied the section 388 petition, made the requisite findings under section 366.26, terminated parental rights and placed C.C. for adoption.

We disagree that the court's comments indicate that it was not aware that it had the discretion to do anything other than terminate parental rights. Section 366.26 provides that when reunification has failed, the child is adoptable, there is clear and convincing evidence that the child will be adopted within a reasonable time, and none of the statutory exceptions applies, the court must terminate parental rights and place the child for adoption. (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53; § 366.26, subd. (c).) One exception to the statutory preference for adoption is the relative caregiver guardianship exception: "If the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption . . . unless . . . [t]he child is living with a relative who is unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and the removal of the child from the custody of his or her relative would be detrimental to the emotional well-being of the child." (§ 366.26, subd. (c)(1)(A).) We understand the court's statement as acknowledging that this

10

exception does not apply because C.C.'s relative caregivers wanted to adopt him. It does not reflect a lack of understanding that if mother had requested an additional continuance, the court had the discretion to grant it upon a finding of good cause.

Mother contends that in spite of her failure to ask the court to continue that hearing in order to determine whether services from IRC could have allowed her to reunify with C.C., the court should have done so on its own motion. Under a separate subheading, mother makes essentially the same argument, contending that the statement in her section 388 petition that she had applied to IRC for services "should have . . . re-triggered the court's obligation to ensure that all services specially designed to meet Mother's developmental disability had been explored prior to terminating parental rights." (Boldface and italics omitted.) Mother does not contend that her section 388 petition should have been granted. She contends only that the court should have continued the section 366.26 hearing "in order for [CFS] to follow up with IRC and to gauge Mother's progress."

We agree that the court could have done as mother now suggests. Section 352 provides that a court may continue any hearing in a dependency matter, "[u]pon request of counsel for the parent" or another party, subject to a showing of good cause and a showing that the continuance is in the child's best interest. (§ 352, subd. (a).) This includes a section 366.26 hearing. (See *In re B.C.* (2011) 192 Cal.App.4th 129, 143-144.) However, neither section 352 nor any other authority that we are aware of requires a court to do so on its own motion or holds that in the absence of a request it may be an abuse of discretion not to continue a hearing. Here, the record shows that mother did not

11

ask the court to continue the hearing or to conduct any further assessment. Consequently, the court's duty to determine whether to exercise its discretion to grant a continuance did not arise.

We agree that a referral to IRC would have been an appropriate service in this case. However, mother has forfeited the right to review of a contention that services were not reasonable as a result of the failure to include a referral to IRC. A claim that reasonable services were not provided is cognizable in a writ proceeding brought after an order terminating services and setting a section 366.26 hearing. (*Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 260.) The issue may not be raised on appeal from a subsequent order terminating parental rights unless it was raised in the writ petition but not decided on its merits by the reviewing court. (§ 366.26, subd. (*l*)(1), (*l*)(2); Cal. Rules of Court, rule 5.695(h)(16), (h)(17).) At the 12-month review hearing, at which services were terminated, mother's attorney argued that services were inadequate because, among other things, mother had never been referred to a parenting coach or any other service specifically geared toward individuals with developmental delays. Nevertheless, mother did not file a writ petition, and she implicitly concedes that she cannot raise the issue now.[5]

---

[5] We have previously taken judicial notice that mother filed a notice of intent to file a writ petition following the order setting the section 366.26 hearing but later withdrew it. (*T.O. v. Superior Court*, E057202, *supra*; Evid. Code, § 452, subd. (d).)

12

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

RICHLI
J.

MILLER
J.

13