Filed 4/8/14  In re J.L. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re J.L., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>E.L.,<br><br>        Defendant and Appellant. | E060107<br><br>(Super.Ct.No. J242252)<br><br>**OPINION** |

APPEAL from the Superior Court of San Bernardino County.  Lily L. Sinfield, Judge.  Affirmed.

Jasmine J. Turner-Bond, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Dawn M. Messer, Deputy County Counsel, for Plaintiff and Respondent.

1

E.L. appeals from an order terminating parental rights to his toddler-aged son J.L. The father argues that the juvenile court erred by denying his "changed circumstances" petition pursuant to Welfare and Institutions Code section 388 (section 388). We find no error. Hence, we will affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

E.L. (father) and J.G. (mother) are the parents of J.L. (sometimes baby or child).

As of December 2011, the father was 16; the mother was 14; and the child was four months old.

One day that month, when both parents were at the father's mother's home in Rialto, they got into an argument. As they were leaving, the father drove off with the baby, leaving the mother behind. Later, he phoned her and told her that he and the baby were going to spend the night at her mother's home in San Bernardino. Thus, she spent the night at his mother's home in Rialto.

Meanwhile, the mother's mother and stepfather had gone out to a party. When the father arrived at their home in San Bernardino and found no one there, he broke in.

Around 6:00 a.m., the mother's mother and stepfather returned home and found the father and the baby there. At this point, the baby had two black eyes, scratches on both cheeks, and several bruises on his back. The mother's stepfather asked the father about the baby's injuries. The father got angry and tried to leave. The stepfather tried to detain him, and a fight broke out. The father punched the stepfather, cutting his ear. The

2

stepfather also punched the father, cutting his lip. The father broke free and left the home. He proceeded to smash three of the windows of the stepfather's car.

The father later admitted to his own stepfather that he "slapped" the baby because "the baby would not stop crying." He likewise admitted to the mother that he hit the baby.

When the police interviewed the mother, she had several scratches and a bruise on her face. She explained that the father had hit her a few days earlier.

The Department of Children and Family Services detained J.L. and filed a dependency petition concerning him. He was placed in foster care.

When a social worker interviewed the mother, she admitted that both she and the father used marijuana. She also admitted that the father had used physical force on her during arguments.

The father had an "extensive" juvenile history; he was on probation at the time and had "active warrants." In February 2012, he was located and arrested.

Later in February, at the jurisdictional/dispositional hearing, the juvenile court found jurisdiction based on serious physical harm (Welf. & Inst. Code, § 300, subd. (a)) failure to protect (*id*., § 300, subd. (b)), and serious physical abuse to a child under five (*id*., § 300, subd. (e)). It formally removed the child from the parents' custody and ordered reunification services for both parents.

The father was placed in a group home. On March 13, 2012, the social worker gave him referrals for services. He began participating in some services. On March 29,

3

2012, however, he ran away from his group home. He remained at large until he was rearrested about four months later. During this time, he did not visit the child, did not participate in services, and did not contact the social worker. However, he was in contact with the mother, and he "continued to engage in domestic violence" with her.

In September 2012, at the six-month review hearing, the juvenile court terminated the father's reunification services but continued the mother's reunification services.

Sometime before January 2013, the father was committed to a juvenile correctional facility.

In June 2013, at the 12-month review hearing, the juvenile court terminated the mother's reunification services and set a hearing pursuant to Welfare and Institutions Code section 366.26 (section 366.26 hearing). That same day, the child was placed with the mother's mother and stepfather, who wanted to adopt him.[1]

In September 2013, the father filed a section 388 petition. The juvenile court set a non-evidentiary hearing on the section 388 petition for the same date as the section 366.26 hearing.

In November 2013, the juvenile court held a hearing on the section 388 petition. After hearing argument, it denied the petition, finding that it failed to allege a change of

---

[1] Although the placement technically occurred in June, there had been efforts starting around March to get the child accustomed to the prospective adoptive parents by spending increasing amounts of time with them.

4

circumstances and failed to allege that granting the petition would be in the child's best interests.

The juvenile court then proceeded to hold a section 366.26 hearing. After once again hearing argument, it found that J.L. was likely to be adopted and that there was no applicable exception to termination. It therefore terminated parental rights.

II

THE DENIAL OF THE SECTION 388 PETITION

A.      *Additional Procedural Background.*

Back in September 2012, at the six-month review hearing, the father's counsel had asked the juvenile court not to terminate the father's reunification services. She argued: "He is being sent next month to the youth authority where he can take part in counseling, parenting, . . . anger management and some other courses that would help him be an efficient and good parent to his son if he were given the chance to do so.

"While I understand that my client can eventually[,] if he puts himself in a position to do so[,] put in for a 388, given his youth I doubt that the 388 would be as effective as having reunification at this time be extended. And we would ask the Court as a result of that to consider giving my client six more months." She added, "Since he will be pretty much a captive audience at youth authority, I think he would do much better . . . if he were afforded services there."

The father's guardian ad litem also stated, "[Y]outh authority does have a rather intense fathering program . . . for minor fathers . . . which they highly incentivize . . . to

5

get them to work through them. How that will work out, I really don't know. But he would definitely like to try that.

" . . . [I]f we don't give him that chance, . . . what I see occurring is that in essence we are terminating his parental rights today. Because if he went and did all of the youth authority programs on his own after services have been terminated, regardless he could never show that it would be in the best interest of the child . . . for a 388 petition."

The juvenile court asked the father how long he was going to be incarcerated; he admitted that he was going to be incarcerated for about two years. The juvenile court then declined to extend the father's services.

B.      *Additional Factual Background.*

The father visited the child only once. The child cried during most of the visit; he appeared anxious and did not want to be held by the father. The father "spent a lot of time looking at the child from a distance."

Meanwhile, J.L. "appear[ed] well attached" to the prospective adoptive parents. They had a "parent and child" relationship with him. "He seeks them out for comfort and guidance. [They] anticipate his needs and meet them appropriately and with affection." He called them "mama" and "papa." "[H]e appear[ed] comfortable in his environment." They were "willing, able and committed to meeting the child's social, medical, financial and psychological needs . . . ."

According to the father's section 388 petition, since being committed to a juvenile correctional facility, he had "completed and benefited from" various reunification-type

6

services, consisting of vocational training, "Aggression Interruption Training," "Step 5" and "Step 6" of Narcotics Anonymous, and "Module V" and "Module VII" of "Project IMPACT – Incarcerated Men Putting Away Childish Things."

The father had written a letter to the mother's mother (i.e., the prospective adoptive mother). In it, he apologized for his "irresponsible behavior" and for the "harm" he had caused to J.L., and he thanked her for caring for J.L.

The father's scheduled release date was April 2014. However, he had two months' credit, so he might actually be released in late February or early March 2014.

C. *Analysis*.

"To prevail on a section 388 petition, the moving party must establish that new evidence or changed circumstances exist so that the proposed change in the court's order would promote the best interests of the child. [Citations.] Unless the moving party makes a prima facie showing of both elements, the petition may [be] denied without an evidentiary hearing. [Citation.]" (*In re Marcelo B*. (2012) 209 Cal.App.4th 635, 641-642.)

"'Whether [the petitioner] made a prima facie showing entitling [the petitioner] to a hearing depends on the facts alleged in [the] petition, as well as the facts established as without dispute by the [dependency] court's own file . . . .' [Citation.]" (*In re B.C.* (2011) 192 Cal.App.4th 129, 141 [brackets in original].) "In considering whether the petitioner has made the requisite showing, the juvenile court may consider the entire

factual and procedural history of the case.  [Citation.]" (*In re Mickel O*. (2011) 197 Cal.App.4th 586, 616.)

"We review the grant or denial of a petition for modification under section 388 for an abuse of discretion.  [Citations.]" (*In re Y.M.* (2012) 207 Cal.App.4th 892, 918.)  ". . . 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'  [Citation.]" (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319, original quotation marks corrected.)  "'The denial of a section 388 motion rarely merits reversal as an abuse of discretion.'  [Citation.]" (*In re Daniel C*. (2006) 141 Cal.App.4th 1438, 1445.)

Here, the juvenile court could reasonably find that the father's use of services while in a juvenile correctional facility was not a changed circumstance.  The father's petition asked the juvenile court to reinstate reunification services, and thus to modify its September 2012 order terminating reunification services.  In September 2012, however, his counsel and his guardian ad litem had both argued that the court should continue reunification services because he was about to enter a juvenile correctional facility and he was going to make use of the services available there.  The court terminated reunification services regardless.  Thus, it had already considered and rejected the assertedly changed circumstance as a reason to continue reunification services.

Separately and alternatively, the juvenile court could reasonably find that granting the petition would not promote the best interests of the child.  "[B]est interests is a

complex idea," and "a number of factors should be examined." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530.) These include "the strength of relative bonds between the dependent child[] to *both* parent and caretakers . . . ." (*Id*. at p. 532.) They also include "[t]he seriousness of the problem which led to the dependency, . . . the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Ibid*.) None of these factors favor the father.

Starting with the relative strength of the competing bonds, the prospective adoptive parents were in undisputed possession of the field. The father had zero relationship with the child. He had visited the child only once, and that visit had not gone well. Moreover, he would not be out of custody — and thus not able to even start establishing a relationship — until February 2014, at the very earliest. This would be three years and three months after the initial removal. Ordinarily, services are not supposed to continue for more than two years after removal, at most. (Welf. & Inst. Code, §§ 361.5, subd. (a)(4), 366.22, subd. (b).) Arguably, a section 388 petition can be used to lengthen this period, in an appropriate case (see *In re Marilyn H*. (1993) 5 Cal.4th 295, 309-310), but only up to a point. "Childhood does not wait for the parent to become adequate." (*Id*. at p. 310.)

On the other hand, the prospective adoptive parents had established a fully parental relationship with the child. He had been placed with them for about five months; he had been visiting them for about three months before that. He expected them to meet all his needs, and they fulfilled his expectation.

9

Turning to the reason for the dependency, here, it was extremely serious — the father struck a four-month-old baby multiple times, simply because the baby cried. More generally, he dealt with opposition and frustration by acting out violently. Thus, at a young age, he had already become a recidivist criminal. This was a course not easily reversed. While he had since completed "Aggression Interruption Training," he had not had to test his new-found skills in the world outside a juvenile correctional facility. Moreover, it does not appear that he had taken any parenting classes. The juvenile court could reasonably conclude that he had not adequately addressed the conditions leading to the dependency.

We therefore conclude that the juvenile court properly denied the section 388 petition without a hearing.

III

DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
Acting P. J.

We concur:

MILLER
J.

CODRINGTON
J.

10