Filed 11/23/22 In re C.M. CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re C.M., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>J.T.,<br><br>　　　Defendant and Appellant. | A165213<br><br>(Alameda County Super. Ct. No. JD03265501) |

　　J.T. (mother) appeals from an order terminating her parental rights under Welfare and Institutions Code section 366.26.[1]  Mother advances two claims on appeal—that the juvenile court abused its discretion in denying her counsel's request for a continuance of the selection and implementation hearing, and that the Alameda County Social Services Agency (Agency) failed to comply with its initial inquiry duties under the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.).  We conclude there was no abuse of

---

[1] All further statutory references will be to the Welfare and Institutions Codes unless otherwise indicated.

1

discretion in refusing to continue the hearing, but we agree with the latter claim and conditionally reverse for further ICWA proceedings.

**BACKGROUND**[2]

In August 2020, the Dublin Police Department took then one-month-old minor into protective custody after mother and father were pulled over for running a stop light. After speaking to parents and a subsequent search of the vehicle, parents were arrested for child endangerment, possession of methamphetamine for sale, and possession of heroin for sale. Father was also arrested for being a felon in possession of a firearm, being a felon in possession of ammunition, possession of a controlled substance and narcotic while armed, possession of a loaded firearm in a vehicle, driving on a suspended license, possession of drug paraphernalia, and misdemeanor probation violation.

The Agency filed, and later amended, a section 300 petition alleging failure to protect minor (§ 300, subd. (b)).

The court detained minor, and mother contested the allegations in the petition. Thereafter, the court declared minor a dependent, sustained the amended petition, and ordered reunifications services.

At the six-month hearing in June 2021, the court found ICWA did not apply.

At the 12-month review hearing, the court terminated parents' reunification services and set a section 366.26 selection and implementation hearing.

At the March 2022 section 366.26 hearing, the juvenile court terminated parental rights and ordered adoption as the permanent plan for minor. The court also reaffirmed its finding that ICWA was inapplicable.

---

[2] We recite only those facts relevant to the issues on appeal.

2

## DISCUSSION

### *Denial of Continuance*

#### *Additional Background*

Neither parent was present at the section 366.26 hearing. Mother's counsel asked "for a brief continuance on her behalf," stating she had not heard from mother. Counsel had "been unable to recently reach" mother, but had provided her with a copy of the section 366.26 report by e-mail. Mother responded by e-mail, stating she had a "new phone number [and] . . . wished to speak . . . about the matter." Counsel e-mailed, texted, and called mother at both the newly provided number and her old number but "had no response from her." Counsel went on to state, she had "concern[s] that [mother] may be experiencing some significant financial difficulties. I don't have proof that she's not receiving my messages, but I am concerned, given her financial situation, that she may not have. And so I'm asking for a brief continuance to attempt to further reach her so that she can further appear and present her position to the Court."

The court denied the request, finding mother's lack of responsiveness to counsel did "not constitute good cause."[3]

After hearing argument from counsel on the application of the beneficial relationship exception, the court found minor was adoptable and no exception applied. The court then terminated parental rights and set the matter for a six-month post-permanency review hearing.

---

[3] Father's counsel made a separate motion to continue, explaining she had tried to reach father "by telephone and text message and have not received a response." The court denied this motion, as well, stating it was not "good cause in the eyes of the Court, simply being nonresponsive to Counsel's attempt to reach out to a client. [¶] And without more, the Court finds that there is no good cause to do so, and delaying this proceeding would be contrary to the best interests of the child."

*Discussion*

Mother contends the juvenile court abused its discretion in refusing to grant counsel's request for a continuance at the selection and implementation hearing.

Section 352 governs continuances in dependency proceedings. (See *In re M.F.* (2022) 74 Cal.App.5th 86, 102.) It provides that "if it is not contrary to the interests of the minor child, a trial court may grant a continuance in a dependency case for good cause shown, for the period of time shown to be necessary, and further provides that when considering whether to grant a continuance the court 'shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.' " (*In re B.C.* (2011) 192 Cal.App.4th 129, 143–144; *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 779–780 (*Elizabeth M.*).)

To request "a continuance of the hearing, written notice shall be filed at least two court days prior to the date set for the hearing, together with affidavits or declarations detailing specific facts showing that a continuance is necessary, unless the court for good cause entertains an oral motion for continuance." (§ 352, subd. (a)(3).) "We review an order denying or granting a continuance for abuse of discretion. [Citations.] 'To show abuse of discretion, the appellant must demonstrate the juvenile court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice.' " (*Elizabeth M., supra*, 19 Cal.App.5th at p. 780.)

There is nothing in the record to indicate mother (or father) requested a continuance at any time prior to the section 366.26 hearing, let alone filed the required application and supporting documentation.

4

Even assuming mother's request was timely and properly made, the juvenile court did not abuse its discretion in denying it as she made no showing of good cause.

Minor's dependency began one month after her birth in August 2020, and, by the time of the March 2022 hearing, she was approximately 20 months old. Minor was thriving in her foster family, a home which included her half siblings. Although mother's counsel speculated the reason for mother's absence was due to her "experiencing some significant financial difficulties," she had no "proof that [mother was] not receiving my messages." Indeed, mother had responded when her counsel sent her a copy of the section 366.26 report. (Father had also stated "they do not always answer the calls from the Agency," but that they would "receive[] messages and call back.") Although mother had missed some other hearings, she had been present at the previous hearing and was aware of the date of the section 366.26 hearing. Mother had also been able to call in for prior hearings and was aware of the procedure for doing so.

As the juvenile court emphasized, mother's unresponsiveness to her counsel was not good cause and "delaying th[e] proceeding would be contrary to the best interests of the child." In sum, the court's denial of a continuance was neither arbitrary nor irrational and did not constitute an abuse its discretion. (*Elizabeth M., supra*, 19 Cal.App.5th at p. 779 ["Continuances are discouraged in dependency cases," and the court has discretion to grant a continuance only if it "is not contrary to the interest of the child."].)

**ICWA Duty of Inquiry**

**Additional Background**

The Agency initially was unable to interview parents about ICWA because they were in jail. By the time it filed its jurisdiction report, the

5

Agency had asked mother about any Indian ancestry, and mother "stated that she thinks she does but does not know what tribe. She said that the father does have Native ancestry but does not know what tribe." The social worker asked mother to pass along the Agency's contact information to father.

Both parents later contacted the Agency and mentioned relatives who might be assessed for placement, including father's adult children, as well as minor's maternal aunt and uncle. But they provided no contact information, and minor remained in foster care. The Agency therefore assigned a family-finding engagement worker to search for relatives for placement. The worker performed a search in September and October 2020, including a search for minor's maternal grandmother.

Despite initially claiming Indian ancestry, two weeks later, in September, "both parents stated they do not have Native American ancestry," and the Agency recommended the court find ICWA did not apply.

In a December addendum report, the Agency once again observed both parents had denied "Native American ancestry" and once again recommended the court find ICWA did not apply.

However, at the contested jurisdiction and disposition hearing, when the court asked parents if they had any Indian ancestry, mother responded that she did "[f]rom [her] mother's side," but did not "know what kind." But father again stated he did not have Native American ancestry.

A month later, in an interim report, the Agency reported that mother had clarified she may have Native American ancestry with the Cherokee and "Blackfoot" tribes.[4] Accordingly, the Agency sent notices to the Cherokee and

---

[4] We place "Blackfoot" in quotation marks because "there is frequent[] confusion between the Blackfeet tribe, which is federally recognized, and the

6

Blackfeet tribes, as well as to the Bureau of Indian Affairs and the Department of the Interior.

Father had also now stated that he too may "have Native American ancestry, but was unsure as to what tribes." He "stated he would report back . . . after talking with family members." The Agency noted it would "submit notices again, if appropriate, after hearing from the father regarding his possible heritage."

By the time of the six-month review report, the Agency had received letters from some of the Cherokee and Blackfeet tribes informing them minor was not registered or eligible for membership. Mother now reported the minor's maternal grandmother was deceased, and when she passed away mother had lost "some ancestral information." She stated she did not have a "strong relationship with her father," but that she lived with him during . . . a short period of her childhood years."

Both father and the Agency had spoken to father's paternal aunt. She told the Agency "there is Native American Ancestry in her family," but she did "not remember the name of the tribe." She stated "the name of the tribe is in a book she cannot locate at the moment," and she "referenced the stature of the Indian Tribe as being 'short people.' " Father stated the paternal aunt was the "historian of their family's Native American background," but he had "not been successful with getting the information from his aunt."

In the meantime, in April 2021, minor had transitioned from her prior placement to the home of T.M. T.M. is the mother of minor's paternal adult half-siblings, which included at least one half-sister and two half-brothers. The Agency did not talk to any of minor's adult half-siblings regarding

related Blackfoot tribe which is found in Canada" and thus is not federally recognized. (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1198.)

7

possible Indian ancestry, including her adult half-brother who was present at the section 366.26 hearing.

Neither parent was present at the six-month hearing when the court adopted the Agency's recommendation that ICWA did not apply, and neither parents' counsel objected to the finding. Additionally, counsel did not object at the section 366.26 hearing when the court reaffirmed ICWA did not apply.

*Analysis*

On appeal, mother contends the Agency was derelict in its "duty of inquiry" because it failed to speak to minor's adult half-siblings (with whom she was living), a maternal aunt and uncle, and minor's paternal uncles.

The Agency acknowledges it did not question these relatives about minor's potential Indian ancestry. However, it maintains the juvenile court properly concluded ICWA did not apply, or alternatively, any error was not prejudicial.

"Congress enacted ICWA in 1978 to address concerns regarding the separation of Indian children from their tribes through adoption or foster care placement, usually in non-Indian homes. [Citation.] ICWA established minimum standards for state courts to follow before removing Indian children form their families and placing them in foster care or adoptive homes. [Citations.] In 2006, California adopted various procedural and substantive provisions of ICWA. [Citation.] In 2016, new federal regulations were adopted concerning ICWA compliance. [Citation.] Following the enactment of the federal regulations, California made conforming amendments to its statutes, including portions of the Welfare and Institutions Code related to ICWA notice and inquiry requirements. [Citations.] Those changes became effective January 1, 2019 [citation], and govern here." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048 (*D.S.*).)

8

As relevant here, "section 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his [or her] family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that inquiry creates a 'reason to believe' the child is an Indian child, then the Agency 'shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e). . . .) Third, if that further inquiry results in a reason to know the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*D.S., supra*, 46 Cal.App.5th at p. 1052, italics omitted.)

A parent has standing to raise the issue of ICWA not only on his or her own behalf, but on behalf of the other parent, as well. (*In re B.R.* (2009) 176 Cal.App.4th 773, 779–780.)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence. [Citations.] But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*D.S., supra*, 46 Cal.App.5th at p. 1051.)

We are concerned here with the initial "duty of inquiry." Section 224.2, subdivision (b) provides that "[i]nquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting

9

child abuse or neglect, whether the child is, or may be, an Indian child where the child, the parents, or Indian custodian is domiciled." Extended family member "shall be as defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or siter, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); see § 224.1, subd. (c).)

The record reflects the Agency was in contact with the paternal aunt, knew of an unnamed maternal aunt and uncle, and knew of at least one paternal uncle, as well as minor's adult half-siblings with whom she was placed.

As to mother's relatives, we conclude that substantial evidence supports the court's finding that ICWA did not apply. Mother never supplied the maternal aunt and uncle's contact information, and mother, herself, told the social worker that information regarding her possible ancestry was lost when minor's maternal grandmother died. In short, there was no one else for the Agency to inquire of on mother's side. Additionally, after mother provided the names of two potential tribes, the Agency sent notices to those tribes, as well as to the Bureau of Indian Affairs and the Department of the Interior. The Agency received letters back from the tribes informing them minor was neither a member nor was she eligible for membership.

As to father's relatives, we conclude the Agency erred in failing to inquire of minor's adult half-siblings, as well her paternal uncles about any possible Indian ancestry. We also conclude such error was not harmless.

*Prejudicial Error*

" '[R]ecent appellate jurisprudence has adopted a continuum of tests for prejudice . . . ranging from a per se re rule that any error is always

10

prejudicial, to a test . . . finding no prejudice unless the appealing parent makes a proffer that interviewing extended family members would yield information about potential Indian ancestry.' (*In re A.C.* (2022) 75 Cal.App.5th 1009, 1011. . . .) The range of approaches, along with the passionate dissents to some of those approaches, reflect the challenge in applying the clear legislative mandate to expand ICWA inquiry in situations where, like here, there is no serious reason to believe that further inquiry would reveal additional information that might ultimately lead to evidence that the minor is an Indian child. (Compare *In re T.G.* [(2020)] 58 Cal.App.5th [275,] 295 . . . ['the imposition of a duty to inquire that is significantly more expansive than the duty to provide ICWA notices is premised on the commonsense understanding that, over time, Indian families, particularly those living in major urban centers like Los Angeles, may well have lost the ability to convey accurate information regarding their tribal status'] with *In re A.C., supra*, at p. 1019 (dis. opn. of Crandall, J.) ['As someone who has handled a busy dependency calendar for the three and half years immediately preceding this assignment, it is hard to understate the havoc, expense, and uncertainty caused by these conflicting mandates.'].)" (*In re S.H.* (2022) 82 Cal.App.5th 166, 176.)

We provide a brief summary of the approaches as they currently stand as well as their criticisms:

*1.* A.R.'s *"Reversal Per Se" or "Undeveloped Record" Approach*

*A.R.* opined reversal is required "in all cases where ICWA requirements have been ignored." (*In re A.R.* (2022) 77 Cal.App.5th 197, 207; *ibid.* [adopting "clear rule that requires reversal in all cases where no required ICWA inquiry has been conducted"]; *In re E.V.* (2022) 80 Cal.App.5th 691, 694 [adopting *A.R.*'s "clear rule"]; see *In re G.H.* (2022) 84 Cal.App.5th 15, 32

11

[following *A.R.* and *E.V.*]; see also *In re J.C.* (2022) 77 Cal.App.5th 70, 80 [adopting *Y.W.* rule]; *In re H.V.* (2022) 75 Cal.App.5th 433, 438 [concluding reversible error where "Department failed to discharge its first-step inquiry duty"]; *In re Y.W.* (2021) 70 Cal.App.5th 542, 556 (*Y.W.*) ["failure to conduct an adequate inquiry . . . makes it impossible for [parents] to demonstrate prejudice"].)

Some appellate courts have interpreted this line of cases as essentially holding that an agency's failure to conduct an adequate inquiry requires reversal in all cases because "it is always reasonably probable that a result more favorable to the appellant might be revealed by additional information. This approach would require reversal in all cases where the agency erred." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 743 (*Benjamin M.*); see *In re Y.M.* (2022) 82 Cal.App.5th 901, 912 (*Y.M.*) [citing *A.R.* and *Y.W.* among others as concluding initial ICWA inquiry error "is prejudicial and reversible per se"]; *In re Dezi C.* (2022) 79 Cal.App.5th 769, 774, review granted on Sept. 21, 2022, S275578 (*Dezi C.*) [same].)

However, other courts have distinguished this line of cases and interpreted *A.R.* as holding reversal is required only where there is a record "so undeveloped that the inadequacy of the inquiry is readily apparent and there is simply no basis on which to find substantial evidence would support a contrary conclusion." (*In re K.H.* (2022) 84 Cal.App.5th 566, 618 (*K.H.*); *ibid*. [cautioning against labeling "these cases as generally establishing a reversible per se rule . . . because not all records will be as undeveloped and not all errors will be as patent as in these cases," italics omitted].)

Regardless of how this approach is viewed—either as requiring reversal per se or as requiring reversal depending on the state of the "undeveloped record"—it has been considered but rejected by several courts as inconsistent

12

"with the state harmless error rule." (*Benjamin M., supra*, 70 Cal.App.5th at p. 743; *Y.M., supra*, 82 Cal.App.5th at p. 912 [rejecting reversible per se approach "because it is inherently inconsistent with the requirement in California Constitution, article VI, section 13 that a miscarriage of justice be shown for reversal"]; *In re K.H., supra,* 84 Cal.App.5th at p. 611 [this approach "sets the bar so low as to render the concept of harmless error meaningless"].)

   *2.* Benjamin M.'s *"Readily Obtainable Information" Approach*

   *Benjamin M.* takes the position that if an agency's initial inquiry is deficient, that defect is harmless unless "the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child" and that "the probability of obtaining meaningful information is reasonable." (*Benjamin M., supra*, 70 Cal.App.5th at p. 744.)

   This approach has been criticized because it "focuses on the ease of obtaining information that bears on the question of a child's Indian status rather than whether that information is likely to affect the juvenile court's ICWA finding" and thus "lacks the *outcome* focus that is the hallmark of usual harmlessness review." (*Dezi C., supra*, 79 Cal.App.5th at p. 785; see *K.H., supra*, 84 Cal.App.5th at p. 617 [criticizing *Benjamin M.* approach because it is "potentially susceptible to being read in different ways, depending on whether courts interpret it broadly or narrowly overall, and depending on how they interpret 'readily obtainable information' and 'likely to bear meaningfully' on the inquiry more specifically"].)

   *3.* Dezi C.'s *"Reason to Believe" Approach*

   In *Dezi C.*, the appellate court held that ICWA inquiry error "is harmless unless the record contains information suggesting a reason to

believe that the child may be an 'Indian child' within the meaning of ICWA such that the absence of further inquiry was prejudicial to the juvenile court's finding." (*Dezi C., supra*, 79 Cal.App.5th at pp. 774, 779.) "For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*Id.* at p. 779; *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1014 [adopting *Dezi C.* approach].)

Although this approach addresses the miscarriage of justice requirement, omitted in the reversible per se approach, it has been criticized because it (1) "disregards . . . the rule that on appeal we generally do not consider matters not contained in the trial court record," (2) disregards "the fact that a parent may not necessarily know about any Indian ancestry and, absent an agency's compliance with its . . . duty of inquiry, therefore may not be in a position to make an offer," (3) " 'unreasonabl[y] . . . require[s] a parent to make an affirmative representation of Indian ancestry where the [agency's] failure to conduct an adequate inquiry deprived the parent of the very knowledge needed to make such a claim,' " and (4) "limits its consideration of prejudice to a showing or representation made by the appellant (e.g., a parent), and, in so doing, disregards the fact that parents are not the only parties with an interest in a child's dependency proceedings." (*Y.M., supra*, 82 Cal.App.5th at pp. 913–914.)

*4. A.C.'s Presumptive Affirmance Approach*

In *A.C.,* the Court of Appeal concluded that if an agency's initial inquiry is deficient, that defect will be treated as harmless unless the parent comes forward with a proffer on appeal as to why further inquiry would lead to a different ICWA finding. (*In re A.C.* (2021) 65 Cal.App.5th 1060, 1065 (*A.C.*).)

14

This approach has been criticized as suffering from the "same deficiencies" as the "reason to believe" approach. (*Y.M., supra*, 82 Cal.App.5th at pp. 914–915; *K.H., supra*, 84 Cal.App.5th at p. 614 [Determining "there is little practical difference between the presumptive affirmance rule approved of by *A.C.* and the 'reason to believe' approach in *Dezi C.*"].)

Unsurprisingly, the parties disagree on which standard to adopt. Mother contends "the trend in case law favors either automatic reversal, or application of the *Benjamin M.* rule requiring reversal where there is readily available information likely to bear meaningfully on whether the child has native ancestry or not," and in this case "there were a number of sources of information that were not accessed by the agency." The Agency, in turn, urges that of *Dezi C./Ezequiel G.*

In *Benjamin M.*, the Court of Appeal concluded the agency's failure to inquire was prejudicial. In that case, the father never made an appearance in the proceedings, mother had no reason to know about the father's ancestry, and the agency conceded it never inquired of the father's brother and sister-in-law as to whether there was any Indian ancestry on the minor's paternal side. (*Benjamin, supra*, 70 Cal.App.5th at pp. 744–745.)

In *Dezi C.*, in contrast, the appellate court found any error harmless. In that case, both parents "attested—to the Department, on an official form, and to the juvenile court during their initial appearances—that they had no Indian heritage," both parents had grown up with their biological families, mother pointed to nothing in the record "indicating she or father has any American Indian heritage," and mother made no "proffer on appeal that either parent has any such heritage." (*Dezi C., supra*, 79 Cal.App.5th at pp. 774, 786.)

15

Similarly, in *Ezequiel G.*, the Court of Appeal found any error harmless. Both parents "unequivocally denied Indian ancestry," parents were in "contact with their extended families, and thus the possibility that they might unknowingly be members of a tribe appears trivially small," and mother had "not identified any evidence in the record that would support an inference that she or the children's fathers might unknowingly be members of an Indian tribe." (*Ezequiel G., supra*, 81 Cal.App.5th at p. 1015.)

We need not choose between the competing standards, as the record in this case is not of the same caliber as the records in *Dezi C.* and *Ezequiel G.* Here, there is " 'reason to believe' " further inquiry might lead to a different result because the record indicates father told the Agency about his possible Indian heritage and it did not follow up on that "readily obtainable information" by interviewing his family members. (See *Benjamin M., supra*, 70 Cal.App.5th at p. 744.) We acknowledge there is evidence father grew up with his siblings and had a "large family," and therefore would likely be aware of any Indian heritage, unlike in *A.C., supra*, 75 Cal.App.5th 1017, where the court reversed because the mother was a former dependent who might not have known her cultural heritage and her biological relatives might have had such information. We also acknowledge that father has never made any showing of having Indian ancestry. But, on balance, we conclude the Agency should have at least made contact with father's relatives for whom it had or could readily obtain contact information.

"[R]equiring an adequate initial inquiry be conducted and documented in the record should not translate into an exhaustive inquiry to ensure '[n]o stone is left unturned.' " (*K.H., supra*, 84 Cal.App.5th at p. 603.) We conclude, however, it would not be unduly burdensome for the Agency to conduct a minimum inquiry of father's extended family members who are

16

readily identifiable and for whom it has contact information.  (See *id.,* at p. 620 ["Agencies and lower courts are, by now, on very clear notice of the problems caused when little to no inquiry is made.  While we are not persuaded that compliance with section 224.2 will prove onerous once agencies provide a record of their efforts for the juvenile court to review, we may not interpret the law to relieve either one of their burden of complying with the plain directives of the statute."].)

## DISPOSITION

The juvenile court's finding that ICWA does not apply is conditionally reversed, and the matter is remanded to the juvenile court with directions to order the Agency to comply with the inquiry and documentation provisions section set forth in section 224.2, subdivision (b) and California Rules of Court, rule 5.4815(a)(5) as to father's family.  If after determining an adequate inquiry has been made, the court finds ICWA applies, the court shall vacate its existing order and proceed in compliance with ICWA and related California law.  If the court finds, instead, that ICWA does not apply, its ICWA finding shall be reinstated.  In all other respects, the court's order terminating mother's parental rights is affirmed.

_____
Banke, J.

We concur:

_____
Humes,  P.J.

_____
Devine, J.*

*Judge of the Contra Costa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A165213, In re CM