Filed 3/10/23  Antonio A. v. Superior Court CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ANTONIO A.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SONOMA COUNTY,<br><br>    Respondent;<br><br>SONOMA COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>    Real Party in Interest. | A166810<br><br>(Sonoma County<br>Super. Ct. No. DEP-6516-01 |

Antonio A. (father) petitions this court for extraordinary writ relief from a juvenile court order denying his request for a continuance and terminating his reunification services at the six-month review hearing for his one-year-old daughter, Velma B. (minor).  (Welf. & Inst. Code, § 366.21, subd. (e).)[1]  We conclude there was no abuse of discretion in denying his continuance request and that he voluntarily forfeited his right to challenge the termination of his services.  Accordingly, we deny the petition.

---

[1] Unless otherwise stated, all statutory citations herein are to the Welfare and Institutions Code.

## FACTUAL AND PROCEDURAL BACKGROUND

Minor was born in November 2021, to father and Bobbie B. (mother).[2] At birth, minor tested positive for methamphetamine.

### I. *The Petition.*

On December 2, 2021, a petition was filed pursuant to section 300, subdivisions (b)(1) (risk of serious physical harm/illness) and (j) (sibling abuse or neglect) on behalf of minor and her three-year-old brother, Daniel B. According to the petition, mother tested positive for methamphetamine at minor's birth, had minimal prenatal care, and was unwilling to participate in safety planning for minor. Father was also unwilling to participate in safety planning or take additional protective actions to mitigate risks to minor. In a prior dependency proceeding, Daniel was detained from parents on or about October 12, 2018, due to mother's alcohol and methamphetamine use. The family ultimately reunified, and the case closed in August 2019. However, mother failed to successfully reunify with minor's half sister, Juanita B., and the child was adopted in 2016.

### II. *Detention and Amended Petition.*

On December 3, 2021, a detention hearing was held, after which minor and Daniel were detained and a jurisdiction hearing was set for December 29, 2021.

An amended section 300 petition was filed on December 27, 2021, which added an allegation under subdivision (b) that parents' pattern of escalating domestic conflict placed children at risk of serious physical harm or illness. The amended petition further alleged eight service calls were made to the home in the prior four months that required law enforcement

---

[2] Mother has not filed a writ petition. As such, she is mentioned only when relevant to the issues raised in father's petition.

intervention. Law enforcement responders assessed father as under the influence of alcohol at the time.

## III. *Jurisdiction and Disposition.*

According to the jurisdiction/disposition report filed on December 27, 2021, mother reported separating from father and asking him to leave home because she was concerned about his alcohol use and his possible sexual interest[3] in Daniel. She did not feel supported by father because he kept alcohol in the home. She had requested that he not keep alcohol there.

Father reported feeling surprised by minor's positive toxicology at birth, as he did not know mother was using drugs and believed she was taking good care of Daniel and minor. He also reported not having a phone, and when the social worker tried to schedule a formal interview, he failed to call on the given dates and time frames.

On December 22, 2021, during a meeting between mother and the social worker, the latter asked to speak to father, who was present with mother. When the social worker asked him to respond to the allegations against him, he provided no information other than to say, " 'We are good parents.' "

Parents had at least two visits with the children during which parents seemed "distracted," as if arguing. The department recommended supervised visitation until mother's accusations of father's drinking and sexual interest in Daniel could be investigated. The department noted that father struggled with alcohol misuse and that Daniel had been living in a toxic and chaotic environment with parents.

---

[3] The department opined it was unclear whether mother's accusations of sexual interest were truthful, as mother's information was quite vague.

3

In an updated report filed on February 2, 2022, the social worker reported making several attempts to engage with father before finally interviewing him on January 18, 2022. He reported that his relationship with mother was marred by domestic violence for the prior three years and that she was the aggressor. He explained that mother became aggressive while high, frequently hitting him all over his body. Mother had also prevented him from leaving the house, which caused him to lose jobs; taken his cell phone; and threatened to beat him if he did not oblige her. He reported losing weight because mother did not let him enter the kitchen to eat.

Father confirmed Daniel witnessed mother hitting father at least 10 times. Daniel also exhibited highly dysregulated behaviors that included hitting others and self-harm. Father denied mother's accusation that he expressed sexual interest in Daniel.

The police were summoned to parents' home on November 20, 2021, due to a domestic disturbance. The police report identified mother as the offender and mentioned a previous incident, a week prior, when mother hit father but he declined to report it because he " 'loved her.' " The reporting officer described father's statements as incoherent and wandering because he consumed alcohol before calling 911. Mother denied any domestic violence.

Another incident of domestic violence occurred on January 12, 2022, which led to mother's arrest. Father reported mother hit him twice in the torso with a closed fist during an argument over the children. According to the police report, mother was animated and rambling and had difficulty answering questions. Father declined to seek an emergency protective order or sign a medical release form. Mother later denied being the aggressor or using drugs or alcohol.

The social worker noted some areas of progress. Parents "appear[ed] to [have] officially separate[d] from each other," and father found temporary housing and a new job, after losing another one. He also obtained a reliable cell phone so he could stay in better contact with the department and participate in in-person and video visits with the children. He was also seeking assistance from Family Justice Center Sonoma County.

After several continuances, the jurisdiction/disposition hearing was held on March 21, 2022. The court found true the allegations in the amended section 300 petition as to both children and ordered reunification services for father while bypassing services for mother. The court also set a sixth-month review hearing for September 15, 2022.

## IV.  *De Facto Parent Order and Six-month Review.*

On July 11, 2022, minor's caretakers, who had taken care of minor since she was one day old, filed a de facto parent statement. In their statement, the caretakers described helping minor through withdrawals from narcotics, alcohol, and tobacco and working with a variety of medical providers, including Early Start and UCSF Health Orthopedics and Genetics, to ensure minor received the best possible early services and health care.

At the September 15, 2022, six-month review hearing, the court granted the caretakers' de facto parent request. The court also granted the department's continuance request and trailed the review hearing for the children to October 5, 2022.

In its report for the six-month review hearing, the department recommended terminating father's reunification services as to both children and setting the matter for a section 366.26 hearing. The social worker noted that father was no longer living with mother but was in regular contact with her despite the toxicity of their relationship. Father did not see this as a

5

problem. The social worker described father as extremely codependent on mother.

Father worked three or four days a week as a gardener and had his own vehicle but was paid in cash and did not have a bank account. He also lacked permanent housing. Due to his lack of stable employment, the social worker opined it would be difficult for father to find such housing. He also denied having a drug or alcohol problem and declined to participate in random testing or attend substance abuse meetings.

The social worker opined father did not seem to understand the amount of work and commitment that parenting requires, especially for children with special needs such as Daniel. In fact, he failed to take regular care of his own medical concerns (diabetes), which regularly resulted in serious side effects. While father was referred to weekly individual therapy sessions, he completed only nine sessions in five months and his progress was minimal. Father only sporadically participated in weekly supervised visits[4] with the children despite appearing genuinely to love them. Further, father's parenting teacher was concerned he was not grasping the information and skills that were being taught, describing him as unaware of the children's needs and clueless as to how to care for them.

The social worker, her assistant, father's therapist, and his parenting provider all believed he "may have some cognitive deficiencies, that will impact his ability to keep his children safe and adequately care for." Father's case plan instructed him to participate in a psychological evaluation, which was scheduled for November 11, 2022, and to follow through with treatment recommendations.

---

[4] Father missed, canceled, declined or was late for 18 of 31 scheduled visits.

Meanwhile, the de facto parents expressed a desire to adopt minor, and were described as loving and attentive to her needs. Minor appeared to be thriving and was receiving a plethora of therapies and developmental services.

The six-month review hearing, originally scheduled for September 15, 2022, was continued several times, at least once, on October 5, 2022, at the department's request. On November 2, 2022, the six-month review hearing was continued again, to November 22 and December 12, 2022, in light of the fact that father's psychological evaluation was scheduled for November 17, 2022. However, the minute order from November 22, 2022, states that father "did not attend" his psychological evaluation on November 17 and that it was rescheduled for December 1, 2022. Nonetheless, the December 12, 2022, date for the six-month review hearing stayed on calendar.

On December 12, 2022, father requested another continuance of the hearing. His counsel argued that while father had met twice with the psychologist, they had not yet received the evaluation. This evaluation, counsel argued, would address whether father had cognitive issues that would influence whether he had received reasonable services.

The department opposed father's continuance request, arguing that father delayed participating in the psychological evaluation and minimally participated, or failed to participate, in other services. Moreover, the 12-month review date was rapidly approaching on January 30, 2023, and there was not a substantial likelihood the children could be returned to father's care with an extended reunification period.

The juvenile court agreed with the department and denied father's continuance request. The six-month review hearing thus went forward. Father's counsel expressed father's willingness to stipulate to the termination

7

of his reunification services for minor in exchange for receiving further services for Daniel until the 12-month date. After questioning father, the juvenile court accepted father's waiver of his rights to challenge the termination of his reunification services for minor as knowing and intelligent. The juvenile court further found father made minimal efforts with his case plan, despite the department's making reasonable efforts to return minor through its provision of reasonable services. As such, the court (1) found that returning minor to father would create a substantial risk of detriment to her safety or well-being; (2) terminated his services as to minor; and (3) scheduled her section 366.26 hearing for April 6, 2023.

On December 16, 2022, father filed his notice of intent to file a writ petition.

## DISCUSSION

Father raises two issues for our review: Did the juvenile court err in (1) denying his request for a continuance of the six-month review hearing and (2) terminating his reunification services as to minor at that hearing after finding that the department offered him reasonable services?

### I. *The court did not abuse its discretion in denying father's request for a continuance.*

A request for a continuance is governed by section 352, which provides that a juvenile court may grant a continuance of a hearing only upon a showing of good cause and only if the continuance is not "contrary to the interest of the minor." (§ 352, subds. (a), (b).) "In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (§ 352, subd. (a).) As this language reflects, the Legislature

8

intended section 352 to serve as "an express discouragement of continuances. [Citation.]" (*In re Karla C.* (2003) 113 Cal.App.4th 166, 179–180.)

We review the juvenile court's decision to deny a request for continuance for abuse of discretion. (*In re B.C.* (2011) 192 Cal.App.4th 129, 143–144.) An abuse of discretion may be found only when " ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*In re Caden C.* (2021) 11 Cal.5th 614, 641.)

Here, father contends the juvenile court's denial of his continuance request was an abuse of discretion because the court could not properly assess whether the department provided him reasonable services regarding minor without first receiving and considering the psychological evaluation that was ordered as part of his case plan. Father notes that several of his service providers, including his social worker and individual therapist, expressed concern that he may have cognitive issues that impacted his ability to parent. The psychological evaluation, father reasons, could have shed light on those issues, as well as whether he needed specific services to address his cognitive condition.

Undisputedly, father was referred for the psychological evaluation in August 2022, at which point the department discovered a contractual issue with its service provider that delayed scheduling it. It was not until November 17, 2022, that father's appointment was finally scheduled. However, the November 22, 2022, minute order states that father "did not attend" this appointment and it was rescheduled for December 1, 2022. On that day, and for a second day, father did participate in his psychological evaluation. However, the psychologist's report was not received by the parties in time for the contested six-month review on December 12, 2022.

9

In considering father's continuance request under these circumstances, the juvenile court acknowledged, "[O]bviously the psych eval [*sic*] would be perhaps helpful, you know, it would tell us one way or the other whether [father] has the ability to do this, it's questionable that he does have the ability to do what is necessary to reunify, but we don't know that and we're sort of guessing. And it seems to me that it would be—I mean, I'd prefer to have that information." Ultimately, however, the court denied his request, reasoning that "there [were] multiple failures here." Among other things, father "hasn't done drug treatment"; "hasn't gotten a full-time job to work and support his family"; "doesn't trust banks" and "won't have a bank account"; "has a relationship continuing with the mother, which is very troubling because of her drug use, continued excessive drug use"; "doesn't follow through with individual therapy"; "doesn't follow through with taking care of himself" despite having "a multitude of medical issues"; and, "on top of all that, he's missed 18 out of 31 scheduled visits as of the date of the October report."

Nonetheless, the juvenile court offered, "[W]hen the report comes in, if there's some—I would liberally construe any issues for a [section 388 motion to modify or set aside a prior order] if that becomes necessary or whatever remedy you might be asking for, because there a [*sic*] multitude of issues and we are all quite late in the game and all of these things have been offered to [father], he hasn't taken enough advantage of."

On this thorough record, there are no grounds for concluding the juvenile court " ' " 'exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*In re Caden C.,*

10

*supra*, 11 Cal.5th at p. 641.)[5]  On the contrary, the court considered numerous relevant factors before resting its decision on the need to "give substantial weight to [minor's] need for prompt resolution of . . . her custody status, the need to provide [minor] with stable environments, and the damage to [minor] of prolonged temporary placements."  (§ 352, subd. (a).)  That is exactly what our juvenile dependency policy requires.  (*In re Karla C., supra*, 113 Cal.App.4th at pp. 179–180.)  Accordingly, the denial of father's request for continuance stands.

II.   ***Father knowingly and voluntarily forfeited his right to challenge the termination of his reunification services as to minor.***

Father's remaining challenge is to the court's termination of his reunification services as to minor.  Father does not deny that his case plan progress was minimal.  Rather, he contends the department's provision of services was not reasonable.  The department counters (inter alia) that father forfeited his right to challenge the termination of his services by agreeing in open court to their termination in minor's case in exchange for an extension of services in Daniel's case.  We agree with the department.

At the six-month review hearing, father's counsel advised the juvenile court:  "I believe that we have an agreement to bifurcate the proceedings,

---

[5] Father paints his challenge to the juvenile court's ruling as a violation of due process.  However, father makes no claim that he did not have adequate notice or an opportunity to be heard before the court denied his request.  (See *In re Matthew P.* (1999) 71 Cal.App.4th 841, 851 ["In juvenile dependency litigation, due process focuses on the right to notice and the right to be heard"].)  Moreover, as the department notes, father could have subpoenaed the individual who conducted the psychological evaluation to discuss his cognitive condition.  But father did not, which "weighs against finding a due process violation." (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 537.)  Accordingly, we review his challenge only for an abuse of discretion.

meaning that we will terminate reunification services on Velma since she was the child that was under age three and father was only entitled to three months of reunification services. [¶] I am sorry. Six-months of reunification services." "For Daniel, the question was whether or not he should be considered part of the sibling group, even though they were removed from parental custody at the same time, the Court would have factors to consider under [section] 366.21(e)(4). [¶] And so that being the case, the Department is willing to continue offering Daniel services for father, the 12 full months of reunification services under Daniel, but terminating for Velma."

The court then queried, "He'll have further services for Daniel until the 12-month mark, which is coming up pretty quickly. [¶] And he'll agree to terminate FR for Velma, is that—is that what you understand you're agreeing to, sir?" Father responded, "I understand." The court also asked father whether he had any questions, to which father answered, "I accepted this because I don't want to lose both kids honestly." The court cautioned him that "the 12-month mark is coming up related to Daniel on the 30th of January" and that "giving up one will [not] necessarily make the second issue [regarding his participation in services for Daniel] easier. It's a very uphill climb at this point given where we are and how young your children are." The court also emphasized, "I just want to have the discussion so that we are not misleading [father] in any way. [¶] So, [father], do you have any questions for the Court?" Father responded, "I am in shock. I have a big knot in my throat. I can't talk. I can't speak. I am sorry. I can't."

The following colloquy between the juvenile court and father then occurred:

"THE COURT: Okay. [Father], I understand that you and your lawyer have discussed and that you are willing to waive reunification services for Velma, is that correct?

"[FATHER]: If I waive those rights, she'll go onto adoption?

"THE COURT: That is the path she'll be on, yes.

"[FATHER]: And Daniel?

"THE COURT: Well, first of all, do you understand that if you waive the reunification services, the next will be to terminate your rights and to move to adoption for Velma? That's what we're talking about with Velma. [¶] Do you understand that part?

"[FATHER]: Yes.

"THE COURT: Okay. Then the next thing is you're agreeing to participate in services related to reunification with Daniel.

"[FATHER]: Yes.

"THE COURT: And you need to jump in [on] those services now today because you're way behind the eight ball.

"[FATHER]: I'll do whatever they ask me to do.

"THE COURT: Okay, but they've been asking you all year to do to [*sic*] things and you're not doing them. So I am just saying—

"[FATHER]: I am sorry. I apologize for failing."

Finally, after additional discussion about Daniel's case, the court asked again, "So but is this what you want to do? You want to pursue services for Daniel and you will agree to terminate your services related to Velma, is this correct?" Father agreed, and the court asked him to confirm: "Are you doing this freely and voluntarily?" "And you've had enough time to think about it?"

At this point, father replied that he needed "more time" to consider it, but the court told him, "Sir, there is no more time. Your children have been waiting for you all year to get off the dime and do what you're supposed to do. [¶] So the time is up with Velma." Father replied, "I don't feel well." The court pressed, "So do you want to agree that you'll waive services and continue reunification services for Daniel?" Father stated, "Yes, that's fine," before asking to "get some air."

On this record, we agree with the juvenile court that father knowingly and intelligently waived his right to a contested hearing on the continuation of his reunification services for minor after making minimal progress with his case plan. When, as here, a child is under age three on the date of initial removal from the physical custody of his or her parents, services should not exceed six months unless the court finds a substantial probability of return with an extended 12- or 18-month period. (§ 361.5, subd. (a)(1)(B); *In re J.C.* (2014) 226 Cal.App.4th 503, 528.) Further, a "parent may waive his or her constitutional rights to relationships with the child 'as long as the waivers are "voluntary [citations] and knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." ' [Citations.] It does not matter at what stage of the proceedings the waiver occurs for the court to find it was knowing and intelligent." (*Cynthia C. v. Superior Court* (1999) 72 Cal.App.4th 1196, 1201.)

Here, there is no evidence demonstrating that father was misled, coerced, or confused when he agreed in open court[6] to the court's termination

---

[6] Father points to section 361.5, subdivision (b)(14), whereby a parent, represented by counsel, may voluntarily waive his or her right to receive reunification by executing a waiver of services form. (§ 361.5, subd. (b)(14).) Under this statute, the court must advise the parent "of any right to services and of the possible consequences of a waiver of services, including the

14

of his services as to minor. On the contrary, the juvenile court asked father to confirm several times that he understood that his attorney was stipulating on his behalf to the termination of these services in exchange for the department's agreement to extend services in Daniel's case to the 12-month mark. Father acquiesced and then expressly confirmed that his decision to waive his right to challenge this termination was knowing and voluntary. While the record also reflects that father was emotionally drained by his decision, as he told the court he felt unwell and needed to "get some air," this does not diminish the fact that given the court's thoughtful examination, father fully appreciated his decision and its consequences. (See *San Diego County Dept. of Public Welfare v. Superior Court* (1972) 7 Cal.3d 1, 10 [" 'voluntary [citations] and "knowing [waivers are] intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences" ' "].)

Accordingly, we decline to consider father's challenge to the termination of his services as to minor on forfeiture grounds. (*In re A.K.* (2017) 12 Cal.App.5th 492, 500 [contentions not raised before the juvenile court are forfeited on appeal]; *In re Joanna Y.* (1992) 8 Cal.App.4th 433, 442 [when a parent voluntarily waives reunification services, the parent also waives his or her right to complain of their adequacy on appeal].)

_____

termination of parental rights and placement of the child for adoption. The court shall not accept the waiver of services unless it states on the record its finding that the parent . . . has knowingly and intelligently waived the right to services." (*Ibid.*) As father notes, he did not execute a waiver form. However, father did not waive his right to receive services under section 361.5. Rather, he waived his right to contest the termination of his services at the six-month mark after only minimally participating in them. As such, there was no requirement that he execute a waiver form.

**DISPOSITION**

Father's petition for writ of extraordinary relief is denied.

_____

Jackson, P. J.

WE CONCUR:

_____

Simons, J.

_____

Burns, J.

A166810/*Antonio A. v. Superior Court*