Filed 10/2/25  In re C.H. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re C.H., a Person Coming Under the Juvenile Court Law. | B341674<br><br>(Los Angeles County Super. Ct. No. 22CCJP01908A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>C.H.,<br><br>     Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Juvenile Court Referee.  Affirmed.

Law Offices of Vincent W. Davis & Associates and Vincent W. Davis for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

───────────────

Appellant C.H. (father) appeals from a juvenile court order denying his petition to change a previous order pursuant to Welfare and Institutions Code section 388 without a hearing.[1] We affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Prior dependency history.

In February 2021, the Los Angeles County Department of Children and Family Services (DCFS) received a report that father and mother[2] emotionally abused and neglected minor child C.H. Jr.  According to the caller, mother left the home following a verbal fight with father, and father followed her in his car, leaving nine-month-old C.H. Jr. alone in the family home.  The caller further reported that father forced mother into his car and then slapped her.  Mother later told a detective that father had not physically harmed her, and that paternal grandmother was with C.H. Jr. in the home.  The referral was closed as inconclusive.

In March 2022, DCFS received a referral indicating that father grabbed mother, causing redness, in C.H. Jr.'s presence.  Mother also reported that father had held a knife against her

───────────

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

[2]     Mother is not a party to this appeal.

throat a few days earlier. Mother obtained an emergency protective order against father. DCFS noted that C.H. Jr. was "safe and well cared for" and the report was closed as inconclusive.

## II. Current section 300 petition.

On May 13, 2022, father contacted law enforcement to report that mother was using methamphetamines in the family bathroom, and that mother hit father several times when he confronted her about her drug use. Mother separately contacted law enforcement and reported that father broke down the bathroom door and struck her several times. The responding officer observed scratch marks on father's neck and redness on mother, and discovered a " 'freshly used' " pipe in the bathroom. The officer arrested father and mother.

A DCFS social worker visited the home later that day and observed that C.H. Jr., who was then two years old, had no marks or bruises. Paternal grandmother was caring for the child. She reported that father and mother frequently argued, but denied that either parent ever harmed C.H. Jr. DCFS detained the child "due to caretaker absence, and [ongoing] domestic violence in the home."

Later that day, the social worker interviewed mother. Mother reported that father hit her every day. She denied using drugs and claimed father owned the pipe that was discovered in the home. The social worker also interviewed father, who again reported that he discovered mother using methamphetamines. Father denied hitting mother that day and denied that he had ever struck her in the past. The social worker obtained police call logs which reflected that officers had been called to the family home 10 times between February 2021 and May 2022 to respond

3

to reports of disturbances, domestic violence, battery, and vandalism.

On May 16, 2022, father contacted the DCFS social worker and reported that he had been released, and that he had separated from mother and no longer lived with her. He said he wanted to get custody of C.H. Jr. Father reported that he was enrolled in a domestic violence program and provided an enrollment letter dated March 29, 2022.

On May 17, 2022, DCFS filed a section 300 petition as to C.H. Jr. The petition alleged that mother and father had a history of engaging in violent fights in the child's presence, that this violent conduct endangered the child's physical health and safety and put him at risk of serious physical harm, damage, and danger, and that both parents failed to protect C.H. Jr. from this violence. The petition specifically alleged that father broke down a door and repeatedly struck mother on May 13, 2022, and that mother then pushed, scratched, and struck father. It further alleged mother used methamphetamines on May 13, 2022, and that mother's history of drug use and father's failure to protect C.H. Jr. from that drug use also endangered the child.

At the May 18, 2022 detention hearing, the court ordered C.H. Jr. detained and placed in DCFS custody pending disposition of the section 300 petition. The child was placed with maternal grandmother.

A DCFS investigator interviewed father on June 1, 2022. Father admitted to arguing with mother but denied that their fights ever became physical. He stated he was willing to move out of the family home if C.H. Jr. could be placed with mother. Father tested negative for drugs on May 18, 2022, and June 3, 2022.

4

The DCFS investigator interviewed mother again on June 2, 2022. Mother reported that on May 13, 2022, she and father argued, and father left the home. When father returned, mother was in the bathroom. Father "tore down the door," "grabbed her off the toilet," and "tried to push" her. Mother reported that father "does get aggressive when he is drunk."

Three DCFS social workers interviewed maternal grandmother on June 2, 2022. Maternal grandmother reported seeing redness and bruises around mother's neck, but she did not know whether father caused the injuries. The next day, two DCFS social workers interviewed paternal grandmother, who stated that father and mother "often" argued verbally, but denied ever witnessing physical violence. Paternal grandmother reported that father became very happy and "pull[ed] himself together" after he started a relationship with mother and after C.H. Jr. was born.

DCFS filed a jurisdiction and disposition report on June 9, 2022. Among other things, the report described an August 2021 police report in which mother claimed that father broke her cell phone and carried her inside the family home against her will. Father told officers he had been arguing with mother but asserted that the fight never turned physical. The officers arrested father.

According to the June 2022 DCFS report, mother asserted that father became violent around the time she became pregnant with C.H. Jr. Mother reported that she sometimes became jealous about father's interactions with other women and "would scream at him," and in response father "would smack and push her." The report stated that father denied any recent arrests aside from the May 2022 arrest that led to the section 300

petition in this case. He also denied any physical violence between himself and mother. The report asserted that father and mother both minimized their domestic violence.

At the June 24, 2022 disposition hearing, the juvenile court sustained amended allegations that mother and father had a history of domestic violence and that they engaged in a violent altercation on May 13, 2022, while C.H. Jr. was in the home, that this violence endangered the child, and that both parents failed to protect the child from their domestic violence. The court struck allegations specifically describing the May 13 incident, reasoning that it would not "benefit anyone to have all of the details in the counts." The court found that DCFS had not proved by a preponderance of the evidence that mother's drug use harmed C.H. Jr. and struck both counts based on that allegation. The court sustained the petition as amended, declared C.H. Jr. a dependent of the court, and removed him from mother and father.

The juvenile court ordered reunification services for both parents. It ordered father to complete a 26-week domestic violence program; individual counseling to address anger management, self-esteem, how domestic violence affects young children, and parenting and co-parenting; six consecutive random or on demand drug tests; and, if father reconciled with mother in the future, couples counseling. The court ordered unmonitored visitation for both parents.

## III. Six-month review hearing.

On July 27, 2022, a Multidisciplinary Assessment Child Family Team (CFT) meeting was conducted as to father. Father asserted he wished to reunify with C.H. Jr. and that he was focused on completing the programs required by his case plan.

6

He reported that he was interested in reconciling with mother, but he also acknowledged that their communication methods were not healthy and asked for relevant referrals.

In September 2022, the court ordered that father could have overnight visits with C.H. Jr. at paternal grandmother's home, conditioned on her presence.

DCFS conducted another CFT meeting for father on December 8, 2022. The meeting focused on whether C.H. Jr. should be released to father. A DCFS social worker asked father if any new issues had arisen between him and mother, and father did not report anything.

A December 8, 2022 DCFS status review report asserted father had made "great progress" with his case plan. Specifically, by July 21, 2022, father had completed six required on-demand drug tests, each with a negative result. He attended weekly individual therapy from September 26, 2022, to November 8, 2022. And as of November 3, 2022, father had attended 16 sessions of parent education, domestic violence, and anger management program. DCFS recommended that C.H. Jr. be released to father with family maintenance services.

DCFS soon changed its recommendation. On December 16, 2022, mother informed DCFS that father came to her home on November 30, 2022. He took her phone and found a photograph of mother with another man, became angry, and hit mother in the face. Mother reported that father had continued to emotionally abuse her, and that she finally decided to call law enforcement after father's abuse became violent. Mother obtained an emergency protective order against father. Mother also reported that she found father's old phone and discovered messages on his Instagram account suggesting he had been

7

selling and using drugs.  She speculated that father's angry behavior could indicate he was using methamphetamines.

On December 22, 2022, a DCFS social worker contacted father about the November 30, 2022 altercation.  Father acknowledged an "incident" but asserted mother "was notorious for calling the police when simple misunderstandings occurred." Father denied using drugs and agreed to complete drug tests. The social worker explained that DCFS would be changing its recommendation to continued reunification services out of concern for C.H. Jr.'s safety.  Father said he did not understand, and he eventually ended the call.

DCFS filed a section 385 application on December 22, 2022, seeking to change the recommendation made in its December 8, 2022 status review report.  DCFS reported concerns that father did not understand the significance of his domestic violence. DCFS was particularly concerned that father failed to report the November 30, 2022 altercation during his December 2022 CFS meeting, and that he minimized the incident when DCFS asked him about it.  DCFS also expressed concern that father may be using or selling drugs.  DCFS therefore recommended that the court order continued reunification services for father, and order father to complete a full 52-week domestic violence program and weekly drug tests.  DCFS also recommended that the court order monitored visitation for father.

At the December 23, 2022 six-month review hearing, the court ordered monitored visitation for father and continued the hearing as to other pending issues.

At some point after the December 23, 2022 hearing, DCFS obtained the police report from the November 30, 2022 incident. According to the police report, mother was at home sleeping when

she awoke and discovered father sitting on her bed and looking through her cell phone. Father became angry about something he saw, slapped mother in the face, and left. Mother told officers there had been another domestic violence incident around October 2022, but she could not recall further details.

A DCFS social worker interviewed father again on January 23, 2023. Father claimed that the phone mother identified as father's phone, which contained Instagram messages discussing drug sales, belonged to someone else. Father denied that he had ever sold drugs.

Between December 28, 2022, and January 19, 2023, father completed four negative random drug tests. As of January 13, 2023, father continued to participate in therapy. By January 25, 2023, father had completed 23 sessions of his parent education, domestic violence prevention, and anger management program.

At the January 31, 2023 six-month review hearing, the juvenile court found that returning C.H. Jr. to father would be detrimental to the child's safety and ordered six additional months of reunification services. The court acknowledged father's participation in classes and that he had expressed some insight as to his faults. The court nonetheless found that father only partially complied with his case plan. Specifically, the court observed that "father's compliance has been more technical rather than substantive, even with the comments made by the father that showed insight. The problem is that even with ongoing domestic violence programs, [continued domestic violence] incidents did occur." The court also expressed "grave concern" over father's continued domestic violence, in part because father had minimized the incident by describing it as a "miscommunication." It ordered father to complete a 52-week

9

domestic violence program, with credit for the 23 sessions he had completed previously. The court also ordered father to complete 10 consecutive drug tests, and if each test was negative, further testing would be required only upon reasonable suspicion.

## IV. 12-month review hearing.

By April 4, 2023, father had completed 10 negative drug tests.

A DCFS social worker spoke to mother's therapist on May 3, 2023. The therapist reported that father and mother continued to have "unhealthy communication." When DCFS raised this concern with father, he denied that he communicated with mother in an unhealthy manner.

On May 9, 2023, father's therapist told a DCFS social worker that he was engaged in therapy and took responsibility for his wrongful actions. As of June 28, 2023, father had completed 42 sessions of his 52-week domestic violence program.

Despite father's compliance with his case plan, DCFS remained concerned that father "failed to demonstrate understanding and growth from the case issues in particular with his communication with" mother. On July 25, 2023, DCFS assessed C.H. Jr. at high risk for future abuse or neglect if he were returned to father's care, and recommended continued reunification services for father.

At the July 25, 2023 twelve-month review hearing, the juvenile court found there was a substantial probability of returning C.H. Jr. to the parents' custody by the next court date and extended reunification services a further six months. The court also ordered unmonitored visits for father.

## V. 18-month review hearing.

Father graduated from his therapy program on July 26, 2023, and his therapist reported he had made substantial progress over 10 months of sessions. Father completed his 52-week parent education, domestic violence, and anger management program course on October 11, 2023.

In November 2023, DCFS liberalized father's visitation to overnight visits.

As of January 23, 2024, DCFS recognized father had completed his services and demonstrated some insight into case issues. DCFS expressed continued concern about potential abuse between father and mother, but ultimately assessed C.H. Jr. as at moderate risk of future abuse or neglect if returned to father's custody. DCFS therefore recommended the child reunify with father, so long as father and child resided with paternal grandmother and participated in family preservation services. Because mother continued to struggle with substance abuse, DCFS recommended terminating her reunification services.

At the January 23, 2024 eighteen-month permanency review hearing, the juvenile court was "very pleased" and extended "special congratulations to the father." The court found father had made substantial progress and that returning C.H. Jr. to father would not create a substantial risk to the child's safety. The court therefore ordered C.H. Jr. to father's home, so long as father resided with paternal grandmother or in a DCFS-approved home, and ordered family preservation services for father. The court converted mother's services to enhancement services and ordered a written visitation schedule for mother.

## VI.  Section 340 removal.

On April 29, 2024, DCFS received a report indicating that father had recently physically assaulted mother.  Mother reported that she was out with friends early in the morning of April 28, 2024.  Father called her and offered to drive her home.  Mother was reluctant but eventually accepted.  Father did not immediately arrive, so mother began to walk home.  Soon, father drove up, exited his vehicle, and abruptly hit mother on the back of the head so hard that she fell.  Father continued to hit mother until she felt " 'dazed.' "  A bystander intervened, and father hit mother one more time then fled.

A police report describing the incident indicates mother "was unable to keep track of the events."  According to the report, the bystander saw mother arguing with father while he slowly drove around her in his vehicle.  Mother entered the vehicle briefly and then father tried to push her out.  Mother got out of the vehicle and they continued to argue.  Father then exited the vehicle, ran toward mother, and grabbed her head with one hand while punching her with the other fist.  Mother fell to the ground and father made a kicking motion.  The bystander heard mother scream, " 'Just kill me!' "  When the bystander announced she was calling 911, she heard father yell, " 'Stay out of it bitch, I got you marked!' "  Father then got into his vehicle and drove away.  The bystander made a video of the incident, which DCFS later obtained and provided to the juvenile court.

Mother told a DCFS social worker that father had also hit her in the face around Easter, leaving her with a " 'black eye and busted lip.' "  Mother did not report that incident because father begged her not to.

The social worker contacted father on May 1, 2024, and informed him that DCFS had received reports of a recent domestic violence incident between father and mother. Father asserted any such reports were false. He claimed that his last contact with mother was two weeks earlier. Father accused mother of lying, claimed she "always causes drama," and stated he was worried about mother's drug use.

On May 2, 2024, the DCFS social worker spoke to mother. She reported that father called her angrily and demanded that she "cover up for him so he does not lose" C.H. Jr. Father told mother that if she did not "fix it he would tell [DCFS] the truth about her." Mother decided to press charges against father and pursue a restraining order. On May 15, 2024, mother obtained a criminal protective order against father, which will expire on May 15, 2027.

The social worker also spoke to father on May 2, 2024. Father claimed mother was "reporting lies" and "trying to ruin his life." He "shifted the blame" to mother and asserted mother's drug use was the source of the family's problems.

On May 3, 2024, mother reported that father called her and threatened to report her to Immigration and Customs Enforcement. Mother hung up and blocked father's phone number.

On May 8, 2024, DCFS filed a section 340 application seeking authorization to remove C.H. Jr. from father's custody. The juvenile court granted the application that day. C.H. Jr. was again placed with maternal grandmother.

On May 9, 2024, a DCFS social worker spoke to father. Father again denied that any domestic violence had occurred and again accused mother of lying. He asserted that C.H. Jr. was not

present during the incident, " 'so what does it matter.' " The social worker observed that father's domestic violence was an ongoing case issue and that father repeatedly failed to recognize the potential risk to his child.

## VII.  Section 387 petition and subsequent section 342 petition; termination of reunification services.

On May 10, 2024, DCFS filed a section 387 petition seeking a more restrictive placement and a subsequent removal petition pursuant to section 342, both based on the April 28, 2024 altercation.

On May 13, 2024, the juvenile court determined there was substantial danger to C.H. Jr.'s physical and emotional health and that it would be detrimental for the child to remain in father's home.  The court therefore removed C.H. Jr. from father.

On June 5, 2024, father spoke to a DCFS social worker and again denied hitting mother in the head.  When the social worker told father that there was a video of the incident, father accused mother of throwing a tequila bottle at him.  The social worker told father DCFS would be recommending that the court terminate father's reunification services.

On June 27, 2024, DCFS assessed that there was a very high risk to C.H. Jr. if he remained in his parents' care.  DCFS cited father's ongoing domestic violence against mother, his repeated denials that any violence had occurred, and his failure to take responsibility for his actions.  DCFS also noted that mother continued to use methamphetamines, amphetamines, and marijuana, and tested positive for drugs as recently as May 31, 2024.  DCFS recommended that the court terminate family reunification services for father and mother.

14

At the June 27, 2024 jurisdiction and disposition hearing, father pleaded no contest and entered a settlement as to the section 342 and section 387 petitions. Pursuant to the settlement, the court sustained both petitions with amendments. Specifically, the court sustained allegations that father and mother had a history of violent alterations, that father struck mother on the back of the head on April 28, 2024, and that father struck mother in March 2024 causing a bruised eye and a cut lip.

The court described the video of the April 28, 2024 incident as "very jarring" and "violent and aggressive." It observed that father had custody of C.H. Jr. at the time, and that even if the child was not present during the incident, the parents' relationship was "absolutely toxic" and could have harmed the child. The court noted that DCFS "has been providing reasonable services to the parents to help them reunify, and that we're in the same situation that we were in May of 2022." The court therefore determined reunification attempts had failed, terminated reunification services for both parents, and set a section 366.26 permanency review hearing for October 22, 2024.

## VIII. Father's section 388 petition.

On October 9, 2024, father filed a section 388 petition asking the court to amend its June 27, 2024 order of no reunification services for father. The petition alleged that father had attended additional individual counseling addressing domestic violence, and it attached a letter from a counseling center supporting that father had participated in eight weekly counseling sessions between July and September 2024. The sessions addressed "healthy coping skills, co-parenting, strengthening family systems, improving conflict resolution, psychoeducation on complex trauma, identifying abuse patterns,

15

communication, and clarification of individual roles and needs." Father also submitted records showing he completed eight parenting classes between July and September 2024 and 10 sessions of anger management. His petition further alleged that he had complied with the criminal protective order barring him from contacting mother and that he would not reconcile with mother. Father asked the court to order family reunification services for father or to release C.H. Jr. to father and order family maintenance services. The petition asserted it was in C.H. Jr.'s best interests to reunify with father because father had a bond with the child and consistently and appropriately visited the child.

At the October 22, 2024 section 366.26 hearing, the juvenile court denied father's section 388 petition without an evidentiary hearing. The court explained: "There has been no domestic violence participation since removal. [¶] No discussion of the domestic violence in individual counseling, as noted in the father's exhibits. [¶] And I don't believe that it would be in [the child's] best interests, at this time." The court continued the section 366.26 permanency hearing to the following month.

Father timely appealed the juvenile court order denying his section 388 petition.

## DISCUSSION

Father argues that the juvenile court abused its discretion by summarily denying his section 388 petition without a hearing. For the reasons that follow, we find no abuse of discretion.[3]

### I. Legal standards.

Section 388 allows a parent to petition the juvenile court to modify a prior order based on changed circumstances. (§ 388, subd. (a).) To obtain such a modification, the petitioner must demonstrate by a preponderance of the evidence both a change of circumstance and that the proposed change of order is in the child's best interests. (§ 388, subds. (a) & (d); Cal. Rules of Court, rule 5.570(d); *In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.) "The change of circumstances or new evidence 'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.'" (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)

A section 388 petition "must be liberally construed in favor of its sufficiency." (Cal. Rules of Court, rule 5.570.) "If it appears that the best interests of the child or the nonminor dependent may be promoted by the proposed change of order . . . the court shall order that a hearing be held" on the petition. (§ 388, subd. (d).) However, if the petition fails to make a prima facie showing

---

[3] Father's opening brief also challenges certain juvenile court orders entered in June 2024. These orders were not identified in father's notice of appeal. Moreover, because father's appeal was filed in October 2024, any challenge to the June 2024 orders was untimely. (Cal. Rules of Court, rule 8.406(a)(1).) We therefore decline to consider father's arguments as to the June 2024 orders.

17

of both required elements, the court need not hold a hearing. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806–807.)

"Whether [the petitioner] made a prima facie showing entitling [the petitioner] to a hearing depends on the facts alleged in [the] petition, as well as the facts established as without dispute by the court's own file . . . ." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 461.) "The court may consider factors such as the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner. [Citation.] In assessing the best interests of the child, 'a primary consideration . . . is the goal of assuring stability and continuity.' " (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 616.)

We review the juvenile court's summary denial of a section 388 petition without a hearing for abuse of discretion. (*In re B.C.* (2011) 192 Cal.App.4th 129, 141.) We will not disturb its ruling " ' "unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

## II.  The juvenile court did not abuse its discretion.

Father asserts the trial court abused its discretion by summarily denying his section 388 petition because the petition made a prima facie showing necessary to obtain a hearing. On appeal, father contends "[t]he changed circumstances were that [father] completed his case plan." However, father completed his case plan in January 2024, five months before the June 2024 order that his section 388 petition sought to modify. Because this

18

completion predates the June 2024 order, it is not a change in circumstance that could support a section 388 petition to modify that order.

We focus instead on the changed circumstances identified in father's section 388 petition. The petition alleged that after the June 2024 order was entered, father completed eight weekly individual counseling sessions, eight sessions of a parenting course, and 10 anger management sessions. Yet, none of these programs directly addressed father's domestic violence, which was the problem that led to C.H. Jr.'s removal.[4] Moreover, father had already participated in similar programs extensively. Father first enrolled in domestic violence courses more than two and a half years before he filed his section 388 petition. After completing 16 sessions, father entered mother's home while she was sleeping and hit her in the face. Father eventually completed a 52-week parent education, domestic violence, and anger management program; and he participated in 10 months of individual therapy. Father nonetheless struck mother again in March 2024, causing bruising and a cut lip; and in April 2024 he violently hit her in the back of the head. In short, despite

---

[4]     Father's petition alleged that his continued individual counseling addressed domestic violence. However, as the juvenile court correctly recognized, a letter from the counseling center which father attached to his petition did not list domestic violence as one of the topics addressed in father's therapy. The letter identified topics that conceivably could encompass domestic violence: "improving conflict resolution" and "identifying abuse patterns." But even assuming the eight therapy sessions addressed domestic violence, as we discuss, a few additional sessions did not constitute a change in circumstances in the overall context of this case.

19

receiving extensive reunification services, father continued to engage in the same domestic violence that led to C.H. Jr.'s removal.  Father's "recent completion of yet another program did not constitute a material change in circumstances." (*In re N.F.* (2021) 68 Cal.App.5th 112, 122; *In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615 [change in circumstance supporting section 388 petition must be of a " 'significant nature' "]; but see *In re Hashem H.* (1996) 45 Cal.App.4th 1791, 1799 [18 months of therapy and therapist's recommendation that child return to parent's custody was a meaningful change of circumstance].)

Nor did the juvenile court abuse its discretion in concluding that resuming father's reunification services would not be in C.H. Jr.'s best interests.  Father filed his petition less than two weeks before the scheduled section 366.26 hearing.  "At the point of these proceedings—on the eve of the section 366.26 permanency planning hearing—the child[]'s interest in stability was the court's foremost concern and outweighed any interest in reunification." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 594.) Indeed, after reunification services have been terminated, there is a rebuttable presumption that a child's "stability in an existing placement is in the best interest of the child . . . .  [Citation.]  To rebut that presumption, a parent must make some factual showing that the best interests of the child would be served by modification." (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 465.) In assessing a child's best interests, courts consider:  "(1) The seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it

20

actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.)

Father argues resuming reunification services would be in C.H. Jr.'s best interest because father has a strong bond with the child and visited him consistently and safely. Yet, father fails to meaningfully acknowledge—in his petition or on appeal—the domestic violence that led to C.H. Jr.'s removal.[5] As we have discussed, that violence was serious. The juvenile court described father's actions as "very jarring," "violent and aggressive," and "absolutely toxic." Father also fails to acknowledge the difficulty he faced in attempting to ameliorate his violent conduct. Even after 52 weeks of domestic violence classes and 10 months of individual therapy, father continued to engage in violent altercations with mother. Father also repeatedly denied that any violence occurred and minimized the significance of his actions, suggesting he was unwilling or unable to ameliorate the problem. (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].) The first and third factors support that resuming father's reunification services would not be in C.H. Jr.'s best interests.

As for the second factor, the petition alleged that father had a strong bond with the child. Indeed, as of October 2024, DCFS reported that the two shared a "significant and positive bond."

---

[5] For example, father's opening brief acknowledges that mother accused father of attacking her in April 2024, but he asserts there was "no proof of an assault." Father's briefing omits any reference to the police report, witness account, and videotape of the incident. He also omits that the juvenile court sustained allegations of the assault pursuant to father's own settlement with DCFS.

But father fails to mention that, according to DCFS, the child also had a strong bond with maternal grandmother. C.H. Jr. lived with maternal grandmother for nearly two years during the dependency proceedings, or about half of his young life. Thus, even taking into account father's bond with C.H. Jr., the child's interest in stability is paramount. (*In re Edward H.*, *supra*, 43 Cal.App.4th at p. 594.) The second factor is at best neutral, and, when viewed in the context of the entire record, it does not establish it would be in C.H. Jr.'s best interests to resume father's reunification services. (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 465 [mother's assertion that she bonded with child and participated in visits was insufficient to establish modification was in child's best interests where child also bonded with foster parents who cared for child since birth; denial of section 388 petition without a hearing affirmed].)

In sum, in the context of this case, father's petition failed to allege materially changed circumstances or that resuming father's reunification services would further C.H. Jr.'s best interests. The juvenile court did not abuse its discretion in denying father's section 388 petition without a hearing.

## DISPOSITION

The juvenile court order denying father's section 388 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

HANASONO, J.

We concur:

EDMON, P. J.

EGERTON, J.